## Richmond.

## HOUGHTON v. GRAYBILL.

### NOVEMBER 18th, 1886.

### Absent, LACY, J.

1. RESCISSION—*Fraud—Evidence.*—Fraud is never presumed, but must be alleged and conclusively proved, especially where the contract sought to be rescinded has been consummated by deeds delivered between the parties, even where the party against whom the relief is asked has not been perfectly clear in his dealings.

2. IDEM—*Simplex commendatio.*—Mere general assertions as to value of, and prices offered for, the property, cannot be relied on by purchaser; and if in reliance thereon, he neglects to examine for himself, it is at his own peril.

3. IDEM—*Conditional contracts—Case at bar.*—H. and G. of Philadelphia, agreed that H. should give G. a factory in that city and $15,000, in exchange for two farms in Virginia, both to have a fortnight to examine and determine. H. examined the farms, reported material misrepresentations, and demanded reduction of boot, but rejected G.'s offer to cancel. Later, H. conveyed the factory to G., and executed a trust deed on the farms G. conveyed to him, to secure the $15,000. On default of payment and advertisement of farms for sale, H. brought his bill to enjoin the sale, and to rescind the contract for the misrepresentations discovered by him before and after the delivery of the deeds; but failed to prove any fraud. H. paid $500 into court below in lieu of the required injunction bond, and on dissolving the injunction, the court directed this money to be paid to G. as a credit on his debt, interest and damages. On appeal—

HELD:

    The injunction was rightly dissolved, and the fund under the court's control properly disposed of.

Appeal from two decrees of the circuit court of New Kent county, rendered 27th May, 1882, and 31st May, 1884, respectively, in a cause therein depending wherein Thomas Houghton is complainant and James B. Graybill and S. E. Landis, trustee, are defendants.

Opinion fully states the case.

*W. W. Gordon* and *W. F. C. Gregory,* for the appellant.

*William R. Aylett* and *R. T. Lacy,* for the appellees.

FAUNTLEROY, J., delivered the opinion of the court.

This is an appeal from two decrees of the circuit court of New Kent county, rendered, respectively, on the 27th of May, 1882, and on the 31st of May, 1884, in a cause therein depending, in which the appellant, Thomas Houghton, is complainant, and J. B. Graybill and S. E. Landis, trustee, are defendants.

The transcript of the record shows the following facts: In February, 1881, Thomas Houghton purchased from J. B. Graybill two farms lying in New Kent county, Virginia, called, respectively, "Brick House" and "Hicks," adjoining each other, and constituting together one plantation, situated upon York river; and which were conveyed to the said Thomas Houghton by deed dated March 24, 1881, from J. D. Graybill and wife, according to a plat and survey of the said two tracts, made by A. P. Irons, surveyor, bearing date August 30, 1880, and referred to and incorporated in the said deed. The contract of purchase was in writing, and was embodied in form of a letter from said Thomas Houghton to said J. B. Graybill (both of whom lived in Philadelphia, Pennsylvania), proposing to buy the said tracts of land in Virginia by name and general

designation; and of a letter from said J. B. Graybill to the said Thomas Houghton, responsive to the same, agreeing to sell and accepting the terms proposed, with some modifications of the forms of the security to be taken for the deferred payment of purchase money. The price was $30,000, of which $15,000 was to be paid in certain real property (a factory) situated in Philadelphia, and belonging to the said Thomas Houghton; for the remaining $15,000 a deed of trust to be given upon the said "Brick House" and "Hicks" farms; and the contract provided expressly that both parties thereto should have two weeks' time within which to examine the properties and abandon the contract, at their option, if dissatisfied.

Shortly after the said agreement, but before the deeds were executed and passed, Houghton visited the property in Virginia, and inspected it far enough to see that, in some material points, the representations upon which (as he alleges) he had been induced to make the purchase, were untrue. He then saw Graybill, stated and urged his objections to the property, and insisted that some deductions should be made in the purchase price, in consequence of what he claimed to be misdescriptions of the property. Graybill expressly and wholly refused to make any concessions, but offered and even insisted to rescind the whole contract, and to pay to Houghton $50 to reimburse him for his expenses of trip of observation to the farms in Virginia and back to Philadelphia, and to pay $50 to Houghton's counsel, who had acted for and advised him in the negotiation.

This, Houghton refused and rejected; and the deeds were then passed between them and the purchase finally consummated by the execution and delivery of all the papers as stipulated in the contract of sale, except that the $15,000 of deferred purchase money was enlarged by $600 to compensate Graybill for an incumbrance upon the factory, a much larger

amount than Houghton had supposed to exist and had stated in the negotiation with Graybill; and the deed of trust was executed accordingly to secure the sum of $15,600. Houghton thereupon changed his residence from Philadelphia to the "Brick House" farm, in Virginia, and continued to live there and to occupy and exercise ownership and management over said two farms, even to offering to sell a portion of the "Brick House" farm for $30,000, and affirming that he would not take $200,000 for the whole. He, Houghton, made no complaint until the first installment of interest fell due, under the terms of the deed of trust, and for the default in the payment of which, the trustee, Landis, was proceeding to sell under the said trust deed, when he filed the bill in this suit praying for a rescission of the contract of sale (which he charges to have been induced by the false and fraudulent representations of the defendant, Graybill,) and also praying for an injunction to restrain the said Landis, trustee, from proceeding to sell in execution of the trust.

Upon this bill in chancery, filed in the circuit court of New Kent county, an injunction was awarded to the said Houghton on the 11th day of January, 1882, restraining S. E. Landis, trustee, from selling the "Brick House" and "Hicks" farms under the deed of trust made by Thomas Houghton (appellant) to secure the payment to J. B. Graybill (appellee) $15,600. The representations charged to be false were that the "Brick House" farm had upon it 800 acres of timber land, which was suited for ship timber, and other lumber and wood; that an axe had never been in said timber land; that there were 8000 peach trees of first class on the said farm; a steamboat landing on said farm; and good fishing and oyster grounds on the same, and 325 acres of valuable meadow land.

To this bill the defendants, Graybill and Landis, trustee, the appellees here, filed their joint and several answers at the

ensuing term of the New Kent circuit court, responsive to the bill, in which they deny, as utterly untrue, the allegation that Houghton, the appellant, purchased of Graybill, the appellee, the farms "Brick House" and "Hicks," without having seen or examined them; and that the contract of purchase and sale was made solely upon the representations of Graybill. That by the agreement of purchase and sale, which was accomplished by an exchange of properties, it was expressly stipulated that the contract was dependent upon the said Graybill and Houghton being satisfied with the respective properties exchanged, upon examination of the premises by each party; that Houghton, the appellant, did make a trip to Virginia, did examine the farms "Brick House" and "Hicks," and on his return home to Philadelphia claimed a "*rebate*" (as he termed it) upon the price agreed upon; because he claimed that there was not as much timber, nor as many peach trees, as he expected to find; that there was no steamboat landing, and the meadow not such as he expected; that appellee, Graybill, expressly declined to make any deduction, and offered to rescind the whole contract, to pay Houghton $50 to defray his travelling expenses to and back from Virginia, and also to pay his counsel fees; and demanded his agreement for cancellation, and insisted that as Houghton was not satisfied the contract ought to be annulled. But that Houghton insisted on ratifying the sale and purchase; and Graybill being bound to do so, if Houghton was satisfied, complied with Houghton's demand, and they completed the sale by the execution and delivery of the necessary deeds. That the appellant, Houghton, is a person of intelligence and mature judgment, and that he entered into and finally executed the contract of sale and purchase with a full knowledge of all the facts complained of in his bill, and is therefore bound by the said contract and completed purchase.

Upon the bill and answer and replication and numerous depositions of witnesses filed by the plaintiff and defendants, and argument of counsel, the cause was heard upon the 27th of May, 1882, when the bill was dismissed with costs, the injunction dissolved, and the trustee, Landis, was "authorized and empowered to proceed to execute the deed of trust executed by Thomas Houghton, as if said injunction had never been granted;" although the said Houghton asked and obtained a suspension of the execution of the said decree for sixty days, to apply to the Court of Appeals for a *supersedeas*, he never did so; but at the October term, 1882, of the circuit court of New Kent county filed a bill praying that the aforesaid decree of May 27, 1882, may be reviewed and set aside and annulled; that the defendants, Graybill, and Landis, trustee, be enjoined and restrained from selling or causing to be sold, the lands mentioned in the deed of trust from Thomas Houghton to S. E. Landis, trustee, and that the contract of sale referred to in the original bill be rescinded; and if that relief should not be deemed proper, that a deduction should be ascertained and decreed for the shortage in the amount of land as sold, and also for the failure to convey any right to Mill Creek and Plumb Point landings, and for failure of the mill stream. Upon this bill, an injunction was awarded, according to the prayer of the bill, by Judge B. R. Wellford, Jr., judge of the seventh judicial circuit of Virginia. In this bill of review the proceedings under the original bill of complaint and injunction are recited; and the following new reasons assigned why the sale should again be enjoined and relief be given:

1st. That the contract was for 1,690 acres; that the deed calls for 1,677 acres; and that the quantity is less than the quantity sold, by 350 acres, and that appellant, Houghton, was not aware of this fact until since the rendition of the decree of May 27, 1882.

2d. That within the last four weeks only appellant had learned he had no right to use of Mill Creek, or of Plumb Point Landing, which, he avers, was the only landing for vessels on its front; and that, pending the negotiation for purchase, Graybill's misrepresentations had put a value upon the farms in the above respects which they did not possess, &c.

3d. That at the time of the contract of sale, the mill stream was represented by Graybill to be ample and unfailing at all seasons; and he, appellant, now charges that in dry seasons the said mill stream is utterly worthless, and that these facts had but lately, and by accident, come to his knowledge; that Graybill had not even denied his having made the misrepresentations charged; and that, although the contract gave the parties two weeks time and opportunity for examination, and rejection or acceptance of the properties exchanged, yet he, the appellant, bought the property of the appellee solely upon his representations, and without having examined it.

The appellee's answer explicitly and emphatically denies the charges in the bill, that in selling the farms to Houghton, the appellant, any fraudulent misrepresentations, or any misrepresentations whatever were made; that the bargain was all the time conditional upon, and subject to, the personal examination and inspection of Houghton; and that Houghton did personally visit and inspect the property before concluding and announcing his satisfied option to purchase it, as the depositions and proceedings had, in the original bill, fully and distinctly proved.

The answer denies that in the contract of sale anything was said about the landing at Plumb Point, or Mill creek or the fulness of the flow of the mill stream. That on the contrary, at all times during the negotiation, reference was had to a steamboat landing, which could be secured by constructing a wharf from the neighborhood of Plumb Point, across

the marsh out into York river, that vessels, as complainant well knew, could not navigate Mill creek, but only boats; that as to the mill stream, the appellant, Houghton, had possession of the farms "Brick House" and "Hicks" all during the summer, and could easily have stated for himself, which he does not do, whether it failed or not, instead of relying upon mere hearsay; that as to the discrepancy in the deed of 1,677 acres, instead of 1,690, it is a clerical error if it exists at all, and cannot be considered in a bill of review, as it certainly existed, if at all, before the final decree of May 22d, 1882, and could make no difference, as the deed conveyed the two farms; and if a clerical error, it was made by the attorneys and agents of the complainant, Houghton, who drew the conveyances in Philadelphia; and that A. P. Irons, a first-class surveyor, was employed to make the survey and draw the plat, and that the appellant has had ample time and opportunity to test its accuracy; and that it is too late now, and appellant is estopped to ask for a rescission of the contract, after it was offered to him, and refused by him.

In addition to this answer to the bill of review the appellee filed a demurrer to the bill, which was overruled by the court. Numerous depositions were taken by both Graybill and Houghton, and the case was heard on the 31st of May, 1884, when the decree of that date was entered, dissolving the injunction, and directing the trustee to sell, but retaining the cause, &c.

From this decree the appellant, Houghton, now appeals. Neither the original bill nor the bill of review waives an answer under oath; the answers are equally responsive to the bill; and there is nothing in appellant's proofs to sustain the charges in the bill and overthrow the answers. The doctrine that fraud will not be presumed, but must be distinctly charged and the grounds specified, and must be clearly and conclu-

sively proved as alleged, to justify the court in granting relief against and setting aside a contract, and especially a contract executed by the delivery of deeds, by and between the contracting parties, is familiar and well established by the authorities on equitable jurisprudence; and by the decisions of this court as laid down in the opinion of Judge Richardson in *Rixey* v. *Morehead*, 79 Va. (4th Hansbrough) 576, and in the case of *Crebs* v. *Jones*, 79 Va. (4th Hansbrough) 381, and in *Hord* v. *Colbert*, 48 Gratt. 49.

The case of *Krebs* v. *Jones, supra*, was of striking resemblance to this. There, as here, was an exchange of properties, and visits to and inspections of the properties exchanged. In *Krebs* v. *Jones*, Lewis, P., says: "The enquiry then, is, whether the conveyance sought to be set aside was obtained by fraud or misrepresentations, as alleged in the bill. And here it is hardly necessary to repeat what is so often said, that fraud is never presumed. It must not only be alleged, but it must be strictly and clearly proved as alleged, otherwise relief will be denied, notwithstanding the party against whom the relief is sought may not have been perfectly clear in his dealings."

But the evidence in the record fully disproves the charges in the bill of appellant and sustains the answer, as well in its responsive denials of the charges in the bill, as in its affirmative statements. The witness, Hood, who was one of the legal advisers, who negotiated for the appellee, Houghton, for the purchase and sale, and who also drew the conveyances which passed between Houghton and Graybill to consummate the contract, proves that the negotiations for the contract finally culminated in an offer made by Mr. Houghton to Mr. Graybill in a letter written by him (Hood) at Houghton's request, and signed by Houghton, as follows:

"Mr. Jerome B. Graybill: I will take the Virginia plantation of some 1,690 acres, known as 'Brick House' and 'Hicks,'

situate in New Kent county, the same to be free and clear of all encumbrances, ground rents, charges, &c., title to be good and marketable; and will give you for the same the factory property on Hancock street, below Norris, Philadelphia, renting now for $1,000 per annum, free of all encumbrances, ground rents, &c., excepting a building association mortgage now on it, now reduced to about $900, and a ground rent of $160; if, upon examination, I find the Virginia property or plantation to be such as I expect to find; and I to have two weeks in which to make such examination."

The letter also contained the stipulation that there was to be given in further payment of the agreed purchase price, a purchase money mortgage, secured on the Virginia plantation for $15,000 with interest at six per cent., payable half yearly. Hood says that he took this letter to Mr. Graybill, who gave him to understand that he would accept the proposal with some slight changes and additions made; and that he, Graybill, wrote upon the other side of the same sheet of legal cap paper on which Mr. Houghton's letter was written: "Mr. Thomas Houghton.—I will accept your proposition, excepting that the $15,000 be secured by a deed of trust instead of a purchase money mortgage * * * on the Virginia property as collateral; provided that the factory property in Philadelphia proves upon examination to be such as I expect to find."

The matter, Hood says, then ran on until the afternoon of the last day of the two weeks given in which the examinations were to be made; when, at the desire and instruction of Mr. Houghton, he, Hood, wrote a short note addressed to Mr. Graybill, who was not found at home, saying that Mr. Houghton would take the place. Hood thereupon proceeded to examine titles preparatory to preparing the necessary title deeds; and while he was so doing, and before he had finished,

Mr. Houghton came in one morning and told me, Hood, that he had been down to Virginia to see the place, that it had not the wood upon it that he supposed, and there were not 8000 peach trees, and there was no landing. Hood does not recollect whether Houghton then said anything about a fishery or oyster bed, but he asked Hood to go and see Mr. Graybill and get a *rebate* on account of the deficiencies aforesaid. Hood did go and proposed the matter to Mr. Graybill, who replied: "Houghton wants a rebate, and that ends the matter." He asked Hood for the agreement and started down, followed by Hood, to the office of Carter & Hood, after it. On the way they encountered Mr. Houghton, when Hood told Houghton that Graybill had come for the agreement. They all three went upstairs into the office together, when Mr. Graybill asked for the agreement. He looked at it and said that the time was up, and said to Mr. Houghton: "You want a rebate; the time is up and that finishes or ends it. I will give you $50— which will pay your expenses down and back, as I agreed to do, and will give each of these gentlemen (pointing to Hood and Carter), a check for $25, for their trouble." Mr. Houghton would not accept this; Mr. Houghton arguing that the rebate should be allowed; and Mr. Graybill being willing to concede nothing. Mr. Houghton finally consented to take the place. Mr. Hood told Mr. Graybill that upon getting a statement from the building association of the amount of the mortgage, it amounted to $1,500, instead of $900; and that as it was not convenient to Mr. Houghton to pay the difference in cash, Mr. Houghton wished him to consent that the said difference be included in the deed of trust; which was agreed to, and the deed was so written.

The final settlement was had on the first day of April, 1881. The papers were all prepared and the deeds executed, and a sum of one hundred and odd dollars, found due to Mr. Hough-

ton by Graybill upon the adjustment of some ground rents and insurance policies which were included and transferred in the settlement, was paid by Mr. Graybill to Mr. Houghton. Mr. Hood thereupon then said to Mr. Houghton, "did you deliver this deed to Mr. Graybill?" having there the deed to the Philadelphia factory property, to which Mr. Houghton responded, "Yes." He then said to Mr. Graybill, "did you deliver this deed to Mr. Houghton?" and he replied he *did*. Mr. Graybill had expressed a willingness and even insisted, that the whole matter of the contract should, then and there, be ended, if Mr. Houghton was dissatisfied; but Mr. Houghton wanted the place, and took it, and bought it, with the knowledge that he had from his visit and inspection of the "Brickhouse" and "Hicks" farms. Hood says "the agreement was dependent upon the examination by both parties, unless they choose to waive the right. I understood that Mr. Graybill never examined the factory property; Mr. Houghton examined the Virginia property before the title was passed; and as each delivered to the other the respective deeds, I presume they consented."

The testimony of the witness Hood, detailed at great length, is fully corroborated, by that of his partner, Carter, who says that he saw the agreement of sale, and that an examination by either of the contracting parties could have annulled the contract; that Houghton had fine opportunity, and went down to Virginia, and upon his return home he reported to our firm that the property was not as represented; complained that the fruit trees were not there, as had been stated; that some of the timber had been cut off. Spoke particularly of the wood and fruit trees, and wanted Mr. Graybill to make a rebate. Mr. Graybill refused; but offered to rescind or cancel the contract, and offered to pay Mr. Houghton's expenses, &c., and to pay Carter & Hood, his attorneys.

That Mr. Houghton, after his return from Virginia, and a personal examination of the land, with a full knowledge of the character of the timber, the actual number of the peach trees (which he had counted), the presence or non-presence of a landing, and the fact about the character and quantity of the meadow land, had a full opportunity to rescind the contract, which he expressly rejected, and agreed to accept the property in the condition they were on the 1st day of April, 1881, and passed and accepted the title for the same.

The witness, J. A. Burnett, who had lived on the Virginia lands, the "Brick House," and "Hick's," as a tenant of Mr. Graybill, in 1880, says that Mr. Houghton had a map of the two places, and enquired of him minutely about the boundaries, the creeks, the meadow, the peach orchard, the timber, the landing; and he told him about the fishery and the oysters on the other side of York river. That he asked Mr. Houghton, after his return from a visit to the places, what he thought of them, and he said that it was a very nice place, though there was not the number of peach trees, as they said there were; but as for everything else, he spoke very well of it.

The witness, Samuel A. J. Satler, in whose office Hood & Carter had desk room, was a witness to the interview and transaction between Graybill and Houghton, as detailed in the evidence of Hood, and he corroborates his testimony in every minute and material detail; and especially as to Mr. Graybill's offer to rescind the contract and pay expenses, &c., repeated over and over again, and as oft refused by Houghton, who insisted on the consummation of the agreement of purchase. He says that about the 1st of June thereafter Mr. Houghton told him that there was a very large quantity of fine large timber, white oak and yellow pine, on the plantation, and applied to him for a loan of capital to assist him to market it; and that about the 1st of July Houghton, speaking of the

value of the "Brick House" property, said he would not take two hundred thousand dollars for it, that he estimated the ship timber upon this tract of land to be worth one hundred thousand dollars.

The witness, M. S. Emeroy, was living on the "Brick House" farm when Mr. Houghton arrived there on the 16th of February, 1881. He stayed there until 2 P. M. the next day. The morning of the 17th he hitched up his carriage and drove Mr. Houghton in various directions over the plantation—"Plumb Point," the proposed place and plan for a steamboat landing, the saw-mill, the mill-dam, the marsh or meadow, the woods in which they penetrated on foot for about a mile, and he showed Mr. Houghton the lines of the "Brick House" and "Hicks" farms, and invited him to remain longer, and gave him all the assistance and information which he desired about the farms, which he said he had come to examine.

Kerr on Fraud, pp. 82, 83, says: "Mere general assertions of a vendor of property, as to its value or the price he has been offered for it, &c., &c., are assumed to be so commonly made by persons having property for sale, that a purchaser cannot safely place confidence in them. Affirmations of the sort are always understood as affording to a purchaser no ground for neglecting to examine for himself. They are, strictly speaking, *gratis dicta*. A man who relies on such affirmations, made by a person whose interest might so readily prompt him to invest the property with exaggerated value, does so at his peril, and must take the consequences of his own imprudence. If a man to whom a representation has been made, knows at the time, or discovering before entering into a transaction, that the representation is false, or resorts to other means of knowledge open to him, and chooses to judge for himself in the matter, he cannot avail himself of the fact that there has been misrepresentations, or say he has acted on

the faith of the representation." Kerr on Fraud, 75. " The allegation of misrepresentation may be effectually met by proof, that the party complaining was well aware and cognizant of the real facts of the case, but the proof of the knowledge must be clear and conclusive." Kerr on Fraud, 78.

The evidence in the record in this case shows clearly and conclusively that Houghton had full and critical knowledge, and the most ample time and opportunity of knowledge, of all the matters complained of in his two bills of complaint. And the record shows that even since the pendency of this suit, he had been offered a rescission of the contract by Mr. Graybill, the appellee, which he has rejected, as repeatedly he had done before the deeds were passed and accepted.

We do not think that the court erred in decreeing that the five hundred dollars, which the complainant had paid into court in lieu of the required injunction bond, and security for the costs and damages which the appellee might sustain by reason of the granting of the injunction, should be paid to the appellee, Graybill, and be allowed as a credit to Houghton upon his debt, interest and damages, adjudged to be due by him to Graybill on the dissolution of the injunction. It was a fund in the hands of the court, and was properly and equitably applied by the order of the court in the cause.

There is no error in the decrees complained of, and the same are affirmed.

DECREES AFFIRMED.