ELIZA JORDAN, *in Equity, versus* JOSHUA STEVENS *& als.*

Whatever may have been supposed to be the law in regard to the validity of deeds to take effect *in futuro*, it is now well settled, in this State, that such deeds are not for that reason void.

In this State, jurisdiction in equity, in cases of " mistake," is expressly conferred by statute. Nor is it, in terms, limited to mistakes of *fact*. The Legislature may be presumed to have used the word as generally understood in equity proceedings.

Where the mistake is one of *law*, and where there are other elements, not in themselves sufficient to authorize a court of equity to interpose, but which, combined with such mistake, should entitle the party to be relieved, the Court will afford relief : —

*Thus*, although there be no actual fraud, if one is unduly influenced and misled by the other to do that which he would not have done, but for such influence, and he has in consequence conveyed to the other property without any consideration therefor, or purchased what was already his own, the Court will, if it can be done, restore both of the parties to the same condition as before.

SUIT IN EQUITY, submitted on bill, answers and proofs. The case was argued in writing by

*Howard & Strout*, for the complainant; and by

*E. & F. Fox*, for the respondents,—who cited *Hunt* v. *Rousmanier, Adm'r*, 1 Peters' S. C. R.; *Bank* v. *Daniel*, 12 Peters, 56; *Stewart* v. *Stewart*, 6 Clark & Fin., 964.

The facts in the case are sufficiently stated in the opinion of the Court, which was drawn up by

DAVIS, J.—Jonathan Stevens, the father of the parties to this suit, died in November, 1857, leaving personal property valued at about $3000, and real estate worth nearly $5000. The plaintiff, being a widow, had worked in his family for many years, receiving therefor one dollar a week. A short time before his death he gave her a *life lease* of his homestead in Portland, worth about $2000, *to take effect upon his decease.* Whether he did this for the reason that he thought that he had not paid her enough for her services, or because she *needed* a larger share of the property than

the other heirs, does not appear, and is immaterial. He died intestate, leaving seven children, and the issue of another not living.

The property leased to the plaintiff was described as situated " on Chestnut street." After the death of her father, the plaintiff had the lease altered so as to read " Wilmot street." This was done at the suggestion of some of the defendants. And besides, as the property was otherwise sufficiently described, the mistake of the street did not affect the lease, and the alteration was immaterial.

It is contended that the lease was void, because it was not to take effect *until a future day.* But, whatever may have been supposed to be the law in regard to the validity of deeds to take effect *in futuro*, it is now well settled in this State that such deeds are not for that reason void. *Wyman* v. *Brown*, 50 Maine, 139.

But some of the defendants thought the lease to the plaintiff was invalid, and so informed her. Taking their testimony as true, which we do not question, they did not *intentionally* deceive her on this point. They actually thought there was a defect of which they could take advantage. She was unlearned in every respect, not being able to write her own name. It is evident that she put confidence in them, believing them to be better informed than herself. And supposing, from their representations, that her title to the *homestead*, by the lease, had failed, she was induced by them to relinquish all her interest in the *whole estate* of her father, in consideration of a new life lease from them of the same property embraced in her first lease.

One-eighth of the estate, subject to her life interest in the homestead, must have been worth nearly or quite eight hundred dollars. This she conveyed to them. Their new lease to her *was of no value whatever;* for the title was already in her. Can she obtain relief in equity?

It is claimed that she has no remedy, because there was no *fraud;* and the *mistake* was not one of *fact*, but *of law*.

In this State, jurisdiction in equity, in cases of "mistake,"

is expressly conferred by statute. Nor is it, in terms, limited to mistakes of *fact*. The Legislature may be presumed to have used the word as generally understood in equity proceedings. And therefore we shall have to inquire whether courts of equity have been accustomed to grant relief in cases like the one before us.

This question has frequently arisen, in this country, and in England; and authorities are not wanting, in both countries, in support of the doctrine, that no distinction should be made between mistakes of *law* and mistakes of *fact*.

It is quite true, as Judge REDFIELD observes, (1 Story's Eq., § 130, note,) "that the distinction between mistakes of law, and mistakes of fact, so far as equitable relief is concerned, is one of *policy* rather than of *principle.*" And yet it may not be the less necessary to maintain and observe it. No government could be administered at all, under which ignorance of the *criminal* law should be held a sufficient excuse for violating it. And the same principle is applicable to the *civil* law. This is not on the ground that *every one is presumed to know the law*. For though this is often repeated as an axiom, a presumption so variant from the truth cannot be recognized by the law. The ground on which the doctrine rests is this, — that it is impossible to uphold the government, and so to maintain its administration as to protect public and private rights, except on the principle that the *rights* and *liabilities* of every one shall be the *same as if* he knew the law.

If all contracts made in ignorance of the law were to be held invalid, there would be no certainty in business, and no security in titles. All rights of property would be endangered; and the most important encouragements for industry and enterprise would be taken away. It is *indispensable*, therefore, that the obligation of contracts should be maintained, unless there is some stronger reason for annulling them than a mere mistake of the law. *Champlin* v. *Laytin*, 18 Wend., 407.

This question is discussed at length by Judge STORY; and

nearly all the English and American authorities are referred to, and many of them examined. 1 Story's Eq., c. 5, Redfield's edition. But while the weight of authority is clearly against granting relief *merely* on account of a mistake of the *law*, it seems to be conceded in nearly all the cases, and expressly decided in many of them, that there are exceptions to this rule. *Hunt* v. *Rousmanier*, 1 Pet., 15 ; *Bank of U. S.* v. *Daniel*, 12 Pet., 32.

Instead of saying that there are "exceptions" to the rule, it would probably be more correct to say that, while relief will *never* be granted *merely* on account of the mistake of the law, there are cases where there are *other elements*, not *in themselves* sufficient to authorize the Court to interpose, but which, *combined with* such a mistake, will entitle the party to relief. It is important therefore to inquire *what it is* that, with a mistake of the *law*, will justify the interposition of the Court, where there is no fraud, or accident, or mistake of *fact*.

If a party, who himself knows the law, should *deceive* another, by misrepresenting the law to him ; or, *knowing him* to be ignorant of it, should therein take advantage of him, relief would be granted on the ground of *fraud*. So that such a case is within neither the rule nor the exception.

It has sometimes been said that, when money or other property has been obtained under a mistake of the law, which the defendant *ought not in good conscience to retain*, he should be compelled to restore it. *Northrup* v. *Graves*, 19 Conn., 548 ; *Stedwell* v. *Anderson*, 21 Conn., 139. This is just, as a *principle*, but entirely indefinite, as a *rule*. It proposes nothing but the opinion of the Court in each case, on a matter in regard to which there may be great differences of opinion. It overlooks the *public* interests involved in maintaining the obligation of contracts. Generally, *as between the parties*, a mistake of *law* has as equitable a claim to relief, as a mistake of *fact*.

It is believed that in nearly all such cases, where relief has been granted, in addition to the intrinsic equity in favor

of the plaintiff, two facts have been found; (1,) that there has been a marked disparity in the position and intelligence of the parties, so that they have not been *on equal terms;* (2,) and that the party obtaining the property *persuaded* or *induced* the other to part with it, so that there has been " undue influence" on the one side, and " undue confidence" on the other. 1 Story's Eq., 120. When property has been obtained under such circumstances, and by such means, courts of equity have never hesitated to compel its restoration, though both the parties acted under a mistake of the law. And there would be still stronger reasons for granting relief in such a case, if the party from whom the property had been obtained, *had been led into his mistake of the law by the other party. Sparks* v. *White,* 7 Humph.;, (Tenn.,) 86; *Fitzgerald* v. *Peck,* 4 Littell, (Ky.,) 127.

Thus, in *Pickering* v. *Pickering,* 2 Bea., 31, Lord LANGDALE set aside certain agreements entered into under a mistake of the law, on the ground that " the parties were not on equal terms ;". and that the plaintiff acted under the influence of the defendant. And the same thing was done in *Wheeler* v. *Smith,* 9 How. U. S., 55, because the parties " did not stand on equal ground ;" and the plaintiff " did not act freely, and with a proper understanding of his rights."

This question has arisen more frequently in cases where parties have been mistaken in regard to their titles to real estate. Thus, in *Bingham* v. *Bingham,* 1 Ves., (Sen.,) 126, the defendant sold to the plaintiff property which he already owned; and the Court compelled a restoration of the purchase money. It may have been, as BRONSON, J., suggests,. in *Champlin* v. *Laytin,* 18 Wend., 407, on the ground that the defendant " misled" the plaintiff in regard to his title. But the correctness of the decision is not questioned by Lord COTTENHAM, in *Stewart* v. *Stewart,* 6 Clark & Finnell, 964.

Judge STORY suggests that such a case " seems to involve, in some measure, a mistake of fact, that is, of the fact of *ownership,* arising from a mistake of the law." 1 Story's

Eq., §§ 122, 130. And, in *King* v. *Doolittle*, 1 Head, (Tenn.) 77, the decision is put on that ground. But if all the other facts are agreed, and known to the parties, the question of "ownership" can be nothing but one of *law*. And in such cases, as in others, courts of equity should not interfere, unless it appears that there was a difference in the condition of the parties, so that, instead of both acting voluntarily, one was misled or unduly influenced by the other. Nor will the Court then interpose, in the absence of fraud, unless the *defendant*, as well as the plaintiff, can be restored substantially to the same situation as before. *Crocier* v. *Acer*, 7 Paige, 137.

Nor, where there is a real controversy between parties, and the case is one of any doubt, will the Court set aside a *compromise* fairly made by them, though it should afterwards appear that one has thereby received property to which he was not legally entitled. *Steele* v. *White*, 2 Paige, 478; *Trigg* v. *Reed*, 5 Humph., 529. On the contrary, courts of equity encourage such compromises. But here, too, as in other cases, if the parties are not on equal terms, and one *misleads* the other, and obtains property thereby against right and equity, as well as against law, he will be compelled to restore it. "If a party, acting in ignorance of a plain and settled principle of law," says the Vice Chancellor, Sir John Leach, "*is induced* to give up a portion of his *indisputable property*, under the *name* of a compromise, a court of equity will relieve him from the consequences of his mistake." *Naylor* v. *Winch*, 1 Sim. & Stu., 564. And though this was a *dictum*, the principle was fully applied by the Supreme Court of the United States, in *Wheeler* v. *Smith & als.* previously cited. And the same doctrine has been recognized by this Court in the case of *Freeman* v. *Curtis*, *post*. And, in both of these cases, relief was granted, not on the ground that a mistake of the law *alone* entitles one to relief; but that, though there be no actual fraud, if one is unduly influenced and misled by the other to do that which he would not have done but for such influence, and he

has in consequence conveyed to the other property without any consideration therefor, or purchased what was already legally his own, the Court will, if it can be done, restore both of the parties to the same condition as before.

The case at bar is one of this kind. The parties were not on equal terms. The plaintiff was ignorant, in business affairs, as well as in other respects. Having confidence in the defendants, she relied upon what they told her. It does not appear that she doubted the validity of her father's lease to her, until such doubts were communicated to her from them. The proposition for her to release her interest in all the other property did not originate with *her*, but with *them;* and she was induced to accept it by the *fear*, which *they* had impressed upon her, that she otherwise would have to give up the homestead. She acted under their influence. They believed that there was a defect in the first lease, and they meant to take advantage of it. As was said by the Master of the Rolls, afterwards Lord KENYON, in *Evans* v. *Llewellyn*, 1 Cox, 333, "though there was no fraud, there was something like fraud; for an undue advantage was taken of her situation. The party was not competent to protect herself; and therefore this Court is bound to afford her such protection."

The bill is sustained, with costs. And the defendants must be decreed to pay her a distributive share of the personal estate with interest from the time of distribution, making her equal with them, and to release to her one-eighth of all the real estate, and account to her for her share of the rents and profits of the portion not occupied by her.

APPLETON, C. J., KENT, WALTON and DICKERSON, JJ., concurred.