## WHEELING.

### KORNE v. KORNE.

Submitted June 2, 1887.—Decided June 25, 1887.

1. EQUITY-PLEADING—MULTIFARIOUSNESS—ALTERNATE RELIEF.

A bill in chancery is not multifarious and therefore demurrable, simply because it contains a prayer for alternate relief inconsistent with its prayer for specific relief. (p. 6.)

2. RESCISSION OF CONTRACT—FRAUD—MENTAL CAPACITY.

While the courts may set aside contracts made by persons of great mental weakness, though not amounting to absolute disqualification, when the contracts are grossly inequitable or unjust to such persons, they will not for such cause set aside valid contracts entered into by parties fully competent to contract. (p. 7.)

3. COMPROMISE—CONCLUSIVENESS.

Where a compromise of a doubtful right is fairly made between parties, it is binding and cannot be affected by any subsequent investigation or result; and this is so, whether it is a compromise of a doubtful question of law or fact. (p. 9.)

*The other decisions announced at this term are published in Vol. XXIX.

4. CONTRACT—FOR SUPPORT—INTERPRETATION.

    When a father and mother enter into a contract with their son, whereby they sell to the son a small farm, and as a part of the consideration therefor the son agrees to comfortably support his parents during their lives; and the contract stipulates that it is expressly understood by all the parties, that the parents are to reside on the farm and occupy a portion of the dwelling-house, and the son another portion of the house, and that the son is to keep his parents in "eating at his own table the same as he has for himself." HELD :

    That the son is bound to comfortably support his parents at the dwelling-house on the farm, and not elsewhere. (p. 12.)

*Ewing, Melvin & Riley* for appellants.

*H. M. Russell* and *W. P. Hubbard* for appellee.

SNYDER, JUDGE :

    George Korne and Margaret, his wife, were the owners of a small farm of 38 acres of land in Ohio county, upon which they had resided for a number of years. They also had household and kitchen furniture and some live-stock on the farm, and the said Margaret had on deposit in bank about $1,500 in money. They had five children, four of whom were daughters, and one son, John Korne, and they all had become of age and had married. The son, with his wife and children, were living on a farm adjoining that of his father, and had for some years been cropping the farm of his father on the shares. One of the daughters, who was then a widow, but engaged to marry again, which she soon after did, was living in the house with the old people, who were then old and infirm in body. Under these circumstances the father and mother made a written contract with their son John, dated October 23, 1882, containing the following provisions :

    "That the said John Korne is to move into the house with said George and Margaret Korne, the parties of the first part, and that the said John, party of the second part, takes possession of everything belonging to the parties of the first part, for his (the said John's) own use, to his profit all that he can make off the land now owned by said George Korne; also all the hay, all the hogs, corn, potatoes, and all wheat in the ground and grown in this, as aforesaid, the fall seed-

ing of wheat, etc. It is agreed that parties of the first part will keep one horse for their own use. Said party of second part is to have use of said horse when parties of the first part are not using him. It is further agreed that John Korne, party of the second part, agrees to keep George Korne and Margaret Korne, his wife, in eating at his own table the same that he has for himself; and it is agreed that parties of the first part pay their own doctors' bills and funeral expenses; party of second part all tax. The term of this agreement is for five years, and during the life-time of the parties of the first part. It is also agreed that at the end of five years, or at the death of the parties of the first part, that party of the second part gets or takes everything that relates to personal property or belongs to parties of first part as personal property."

Pursuant to this contract John moved into the house of his parents, and took control of the farm and personal property in the manner agreed upon, and so remained for about one year. At the end of the year all the parties deemed it necessary that the buildings on the farm should be enlarged and improved. In order to get John to make these improvements, all the parties entered into another written contract on October 20, 1883, by which the said George Korne and wife agreed to sell their said farm to John Korne upon the following terms and conditions:

" First. It is expressly understood by all the parties to this agreement that the said George and Margaret Korne are to reside on said farm during the term of their natural lives, and are to occupy a portion of the dwelling-house, and the said John Korne agrees to occupy a portion of said dwelling-house, along with the said parties of the first part, and to comfortably support and maintain the said George and Margaret Korne during the term of their natural lives, and not only to see that they are comfortably provided for with clothing and food, but to see that they are properly and comfortably cared for, both in sickness and health; and as a further consideration for said farm the said John Korne agrees to pay within six months after the death of the said George and Margaret Korne, or the death of the survivor of them, the sum of twelve hundred dollars, as follows: To

Amelia Davis, the sum of three hundred dollars; to Philopena Ewing, the sum of three hundred dollars; to Barbara Kimmins, the sum of three hundred dollars; and to Caroline Higgs, three hundred dollars; and in case of the death of any of the parties above named before receiving their proportion of said twelve hundred dollars, then their share shall be paid direct to their heirs or personal representatives; and in consideration of the promises of the said John Korne, the said George and Margaret agree to deliver the possession of said farm, with the exception before provided for, to the said John Korne, upon the signing of this agreement, for the purpose of improving, cultivating, and managing as his own, and for his own use. And, further, the said George and Margaret Korne have this day acknowledged a deed of general warranty for said farm to the said John Korne, and have placed the deed as acknowledged in the hands of William Bushfield, who is instructed to hold said deed during the life-time of the said George and Margaret Korne; and after the death of the survivor of them, if the said John Korne has faithfully performed his part of this agreement, upon his producing the receipts from his four sisters, or their heirs or personal representatives, for their respective shares of the twelve hundred dollars above mentioned, or satisfactory evidence that he has made a proper tender of the money due to any one or more of them that may have refused to receipt for the same, then the said William Bushfield is directed to deliver the deed over to the said John Korne, his heirs or personal representatives. Further, it is agreed that should the said John Korne die before the death of the parties of the first part to this agreement, upon his wife and family carrying out his part of the agreement, then they are to receive the deed upon the same terms as above provided for. Further, should the said John Korne become dissatisfied, and remove from the premises, or fail or refuse to provide for the parties of the first part as above mentioned, then the said George and Margaret Korne shall have the right to demand the said deed and destroy the same if they wish to do so. But in the event of the said parties of the first part losing their minds from age or disease, then the said William Bushfield shall be perfectly satisfied that the

said John Korne was failing to perform his portion of the agreement before delivering the deed to them, without the approval of the said party of the second part."

Both of said contracts were acknowledged by the parties, and the privy examination of the said Margaret duly certified. In September, 1885, George and Margaret Korne brought this suit in the Circuit Court of Ohio county against their son, John Korne, to set aside both of said contracts, and to have the farm, with its rents and the personal property, restored to them, or to compel the defendant to repay certain money, and pay annually to the plaintiffs a sum sufficient to comfortably support and maintain them during their lives. The bill alleges that the plaintiffs are each about 70 years of age, and in feeble health; that they are Germans, and unable to read or write, and entirely unacquainted with making contracts in relation to real estate, or the effects of the provisions of such contracts; that the aforesaid contracts were procured by the persuasions and promises of the defendant, and signed and acknowledged by the plaintiffs without their having understood the provisions thereof, or having the same explained to them; that after said contracts had been signed, and the defendant had gotten possession of all the plaintiffs' property, he compelled his mother to turn over to him $700 of her own money, he claiming that he was entitled to it under said contracts; that the defendant then became quarrelsome and hateful to the plaintiffs, and refused to provide them with the necessary comforts of life, and denied them proper attention and nourishment in sickness; that about July 4, 1885, he made it so disagreeable for them by his abuse and harsh treatment that they were compelled to leave the farm, and since then, with the exception of one week, they have been living among their relatives and friends; that they are without means, and unable to work, and, although the defendant has all their property, he has not in any manner aided or assisted them, but has wholly failed and refused to furnish them any means; or to confortably support and maintain them; while, on the contrary, he has done much to make their lives uncomfortable and unhappy.

There was a demurrer to the bill, which the court over-

ruled. The defendant answered the bill, denying each and all of its allegations which tended to show that the plaintiffs were entitled to any relief whatever. A great many depositions were taken, including those of all the parties to the suit, and the cause was finally heard on October 6, 1886, when the court entered a decree dismissing the bill, with costs. From this decree the plaintiffs have appealed.

Because the bill prays for relief in the alternative, the counsel for the appellee claim that it was thereby rendered multifarious, and the demurrer should have been sustained. A bill cannot be made multifarious by its prayer. If the specific or alternate relief asked is inconsistent with the averments of the bill, the same will be disregarded, and relief given under the prayer for general relief, if there is such prayer, and the facts averred entitle the plaintiff to any relief. Story, Eq. Pl. §§ 40, 42b. Whether a bill is multifarious or not must be determined from the frame and structure of the bill; that is, from its allegations, and not from its prayer. I think the demurrer was properly overruled.

The appellants assign as error, and contend that the Circuit Court improperly dismissed the bill without granting the relief therein prayed for by the plaintiffs. This position is very general, and comprehends the whole merits of the case. In reference to the execution of the two written contracts assailed in the bill, the testimony clearly establishes that said contracts were fairly and legally executed. The depositions of the plaintiffs themselves fall far short of sustaining the most material allegations of the bill. While it is shown they are Germans, and that the female plaintiff cannot read or write, it is shown that the male plaintiff can both read and write German, and both of them have lived in Ohio county for nearly 50 years, and during that time, or the greater part of it, carried on the huckstering business, and accumulated considerable property. Their depositions indicate very distinctly that they are not only not weak-minded and credulous, but they possess a considerable degree of shrewdness and caution in business transactions. The old man was particularly cautious about the time the contract of October 20, 1883, was executed ; for, after talking over and agreeing upon its provisions, he declared that

he would not execute it until his friend Bushfield was present. All the witnesses, other than the plaintiffs, including the scrivener and officers who took the acknowledgments of the parties, testify positively that the contracts were read over to the plaintiffs two or three times, and explained to them, and that they fully understood the contents of each at the time of the execution.

I think, from all the proofs, there can be no question but that the plaintiffs had ample capacity to understand the provisions of the contracts, as well as every facility and opportunity to do so before they executed and acknowledged the contracts. That they may have possibly misconstrued or failed to comprehend fully the legal effect of all the provisions of the contracts is a matter which they alone can determine. But, be this as it may, it is no ground for impeaching or setting aside the contracts when it distinctly appears, as it does in this instance, that there was no fraud or imposition in procuring the execution, and the parties were fully capable of transacting the business and understanding the facts relating to it. This is not an instance of a contract made by a person of great mental weakness or imbecility. In such case courts have often held that the transaction, when grossly inequitable or unfair, might be set aside, although the incapacity of such person be not an absolute disqualification for the transaction of business. It therefore seems to me that the following cases, and others relied on by the appellants, have no application to this case : *Deem* v. *Phillips*, 5 W. Va. 168 ; *Samuel* v. *Marshall*, 3 Leigh 567 ; *Whitehorn* v. *Hines*, 1 Munf. 557.

There is no pretense for any contention that the first contract was obtained by any effort or undue influence by any one. It was plainly the voluntary act of the plaintiffs, entered into at their own suggestion. The subsequent conduct of the parties, however, tends to show that the plaintiffs either did not fully comprehend the legal effect of all the provisions of said contract, or that they afterwards sought to give it a construction which the defendant refused to recognize or concede, and out of this grew the distrust and dissatisfaction which, it seems to me, have been the principal if not the sole cause of all the unfortunate disagreements

and troubles between the parties. The ground of this dis-
pute as to the construction of this contract will be hereafter
noticed.

Within a year after John moved on the farm under the
first contract, his father made a will, disposing of his prop-
erty substantially as he did by the provisions of the afore-
said contract of October 20, 1883. Of this fact the father in-
formed John, and told him he could now safely go on and
repair the buildings and fences on the farm. John told his
father that the will could be changed at any time, and that
he would not make any improvements on such an uncer-
tainty. It was then agreed that the provisions of the will
should be incorporated into a binding contract. Pursuant
to this understanding, the said contract of October 20, 1883,
and the deed therein referred to were prepared by Dunlap,
an attorney at law, and, after the same had been read and
explained to the parties, they executed and acknowledged it
in the presence of said Dunlap and one Bushfield, who was
there at the request of the father, and as his adviser in the
transaction. It seems to me that this contract, as well as
the one of October 23, 1882, was fairly and voluntarily exe-
cuted by the plaintiffs, with a full understanding of its con-
tents, and without any advantage or undue influence on the
part of the appellant. In the spring following the execution
of this second contract, John, the son, was told that his
father and mother had given a part of the $1,500. in money
which they had to some of his sisters. He then asked his
parents if this was so, and being informed by them that it
was, and that they would give the money to whom they
pleased, he told them that, under the provisions of the said
first contract, they had no right to give the money away;
that they might use so much of it as they might need for
their own uses and comfort during their lives, and that
whatever remained, if anything, at their death was to be his.
They contended that said contract did not include the
money, and that he could not get any of it. John then told
them that, as a compromise, he would take $1,000 and that
they might do as they chose with the balance, and that, if
they did not come to terms, he would put an injunction on the
money in the bank, and let it lay there for their own use.

With the assistance of Bushfield, a compromise was effected, by which John got $700 of the money, and released all claim to the residue.

It is claimed that the conduct of John in obtaining this money was illegal, and constituted duress, and that he should not therefore be permitted to retain it. In regard to this money, there was no trust relation between the parties. The parties were entirely capable of acting for themselves. There was no concealment or misrepresentation of facts, or threat of violence. The whole difference between them was, as we must presume, a *bona fide* dispute about the true meaning and construction of the contract of October 23, 1882. John had a legal right to resort to an injunction, or other legal process, in an effort to secure what he deemed he was entitled to under said contract, and his parents had the same right to defend or maintain their construction. If, under these circumstances, the parties agreed to abate a part of their respective claims, and effect a compromise, they must abide the result, and will not be permitted to have the merits of the controversy subsequently investigated and determined by the courts. Where a compromise of a doubtful right is fairly made between the parties, the compromise is binding, and cannot be affected by any subsequent investigation or result; and this is so, whether it is a compromise of a doubtful question of law or fact. *Durham* v. *Wadlington*, 2 Strob. Eq. 258; *Moore* v. *Fitzwater*, 2 Rand. (Va.) 442; *Mills* v. *Lee*, 6 T. B. Mon. 97; *Bennet* v. *Paine*, 5 Watts 259.

According to the testimony, after this compromise the parties lived together in the same house peaceably, and without any apparent discontent or disturbance, for over two years. It is therefore evident that neither this transaction, nor any act of the son which preceded it, was the immediate cause which produced the subsequent unhappy relations and trouble between the parties which have culminated in the bringing of this suit. But the real cause was, as before intimated, the belief on the part of the plaintiffs that one Samples, who wrote the said contract of October 23, 1882, had deceived them, or intentionally concealed from them the legal effect of said contract. It appears that, at the time

the contract was executed, Samples, who drew it, and before whom the parties acknowledged it, did not tell the plaintiffs, as he afterwards did, that the words "personal property" therein employed included money. This they regarded as bad faith on his part, and afterwards entertained ill feelings towards him. Consequently, when, on July 4, 1885, the plaintiffs found Samples at the house, where he had come on the invitation of their son, they violently abused him, and ordered him away. Their son, the appellee, interfered, and then the row took place which estranged the parties, occasioned the abusive language and resentment which induced the plaintiffs to leave the house, and remain away from the son as they have ever since, with the exception of one week. It is fully shown that harsh and abusive language was used on this occasion by both the appellee and the appellants towards each other. The state of feelings then and subsequently existing between the parties, as shown by the testimony, is greatly to be deplored. But it must be remembered that the bitterness of family feuds or quarrels is proverbial. They have such intimate knowledge of the defects and shortcomings of each other, and esteem it a personal privilege to suffer themselves to speak to or of members from whom they differ, especially near relatives, in a manner they never adopt to or of strangers, and would not permit others to use in reference to those of whom they so speak themselves. In this instance, however, the father admits that he swore as much as John, and that he guessed they were about even in that regard.

About two weeks after this rupture the plaintiffs returned to the house of the son, and remained there one week. They say they then left because John would not speak to them. But, on the other side, John says they would not speak to him, and that he has frequently, both before and since the institution of this suit, asked them to return and live with him, and they positively declined to do so. The testimony wholly fails to show that the son, during the time the father and mother stayed with him, failed, in any respect, to give them all the attention they required, or that he did not support and maintain them comfortably. It seems to me, therefore,

that no sufficient ground has been shown for setting aside either of said contracts.

It is suggested in the brief for the appellants that the deed mentioned in the said contract of October 20, 1883, is revocable at the will of the grantors, the same having never been delivered to the grantee. There is clearly nothing in this suggestion. This deed was delivered as an escrow by the grantors to Bushfield. It is therefore not revocable by the grantors, but will take effect whenever the condition has been complied with upon which it is to be finally delivered. 3 Washb. Real Prop. (584) 268; *Millett* v. *Parker*, 2 Metc. (Ky.) 608.

It is further contended for the appellants that the provisions of the contract, that the parents were to reside on the farm, and occupy a portion of the dwelling-house with the son, and eat at the same table with him, are not covenants to do anything for the son, or for his benefit, but simply the reservation of a right for the advantage of the parents, and a limitation upon the son's right to occupy the house, and that neither is the covenant for the support of the parents conditioned or dependent upon their residing in the house. It is therefore claimed that the right of the parents to demand and receive their support from the son is not conditioned or dependent upon their residing in the house on the farm, and that they are entitled to support from the son, although they had voluntarily left their house. As a general proposition each case of this kind must be decided to a great extent upon its own facts, taking into consideration the language of the instrument and the surrounding circumstances.

In *Dwelley* v. *Dwelley*, 10 N. E. Rep. 469, the court lays down as the only rule to be extracted from the cases as follows : " The court will look at all the circumstances of the case, the nature of the property, the occupation and relation of the parties, the usages of the place and of the business to which the contract relates; and ascertaining by reasonable inference what the parties may have understood and mutually expected at the time of the making of the contract, and then adopt that construction which will best and most nearly carry the contract into effect as they intended and understood it." *Fiske* v. *Fiske*, 20 Pick. 500.

In the case at bar the terms of the contract of October 20, 1883, declare that " it is *expressly understood* by all the parties to this agreement that the said George and Margaret Korne are to reside on the farm during the term of their natural lives, and are to occupy a portion of the dwelling-house ; and the said John Korne agrees to occupy a portion of the dwelling-house along with the said parties of the first part;" and by the contract of October 23, 1882, it is provided " that John Korne agrees to keep George and Margaret Korne, his wife, in eating at his own table, the same that he has for himself." These provisions are so direct and positive that they leave no room for construction or conjecture as to what was the expectation and understanding of the parties. But the relation of the parties being that of parents and son, and the nature of the property, as well as all the other attendant facts, confirm the conclusion that it was the intention and expectation that the support and maintenance were to be furnished at the dwelling-house on the farm, and not elsewhere.

The value of the farm was perhaps less than $2,000 at the time and in the condition it was when the contracts were made. Of this John bound himself to pay $1,200 to his sisters after the death of his parents, thus making the consideration of the support less than its probable cost. It also appears that the son was a farmer, and could therefore, with less expense and with more comfort, keep his parents at his own house than he could raise money to pay for their support elsewhere. Considering, therefore, the contract and all the circumstances, I have no doubt but that it was the intention and expectation of all the parties that the support was to be furnished by John at the house on the farm, and not elsewhere.

It is suggested that to leave these old people in their present unhappy condition is a great hardship. Whether this is true or not is wholly immaterial, and beyond the control of the court. It is the province of courts to enforce valid, and set aside invalid, contracts, but not to vacate valid contracts, or to make or modify contracts made by competent persons on some supposed ground that no contract, or a better one, should have been made by the parties. But it is not certain

that these contracts ought to be condemned as improvident. If all improper influences upon the conduct of these old people are withdrawn, they may return to their son, and receive the full consideration of their contract and live there in comfort and contentment.

The decree of the Circuit Court must be affirmed.

AFFIRMED.