# CHARLESTON.

SCHUTTLER *et al. v.* BRANDFASS *et al.*

Submitted June 8, 1895—Decided November 20, 1895.

1. MISTAKE OF LAW—FRAUD—RELIEF IN EQUITY.

   Mere mistake of law will not alone be ground of relief against a conveyance or other act; but when accompanied by fraud in any form, such as misrepresentation or concealment of facts, imposition, undue influence, or misplaced confidence, or advantage has been in any way taken of one's ignorance of law to mislead him, or where there is a relation of trust and confidence, it will be ground of relief in equity.

2. MISSTATEMENT OF LAW—FRAUD—RELIEF IN EQUITY.

   Mere misstatement of law will not alone constitute fraud to annul a conveyance or other act; but when accompanied by fraud in any form, such as misrepresentation or concealment of fact, imposition, undue influence, or misplaced confidence, or advantage has been taken of one's ignorance of law to mislead him, or there is a relation of trust and confidence between the parties, it will constitute such fraud for relief.

HENRY M. RUSSELL for appellants, cited 19 Wall. 146; 34 W. Va. 217; 38 W. Va. 409; 2 Pom. Eq. Jur. § 850; 30 W. Va. 1; 17 W. Va. 523; 16 W. Va. 32; 30 W. Va. 182; 25 W. Va. 543; 142 U. S. 43.

ATKINSON & FLICK for appellees, cited 17 W. Va. 523 *et seq.;* 2 Pom. Eq. Jur. § 850; 2 Pom. Eq. Jur. § 873, 874, 880, 901, 902; 2 Pom. Eq. Jur. § 311 (1st Edition, 1882); 2 Beach Eq. Jur. § 1005; 132 N. Y. 49; 28 Amer. State Reps. 548; 81 Wis. 67; 29 Amer. State Reps. 866-869; 8 Whar. 215; 15 Am. & Eng. Enc. Law, 638 and notes, also 668;

7 Watts (Pa.) 372; Pollock on Con. 79-86; Lead. Cases in
Eq. vol. 2, part 2, 38, star p. 406; Brett's Lead. Cases in
Ep. 131, star p. 64; 4 Dana, 309; 39 Amer. Decis. 407; 30
W. Va. 1; 7 W. Va. 390; 19 W. Va. 439; 17 W. Va. 717.

BRANNON, JUDGE:

Caroline Schuttler and Joseph Schuttler, her husband,
and Louise Schupbach, filed a bill and amended bill in equi-
ty in the Circuit Court of Ohio county against Charles F.
Brandfass, executor of the will of William Weidebusch,
Mary Brandfass, and Charles F. Brandfass, her husband,
and Minnie Grosscurth, alleging that William Weide-
busch died leaving a will, by which he devised certain real
estate in the city of Wheeling to his four daughters, Caro-
line Schuttler, Louise Schupbach, Mary Brandfass, and
Minnie Grosscurth, giving each a separate parcel, and left
to a son, William Weidebusch, a pecuniary legacy of seven
hundred dollars, of which Caroline Schuttler was to pay
three hundred dollars, and Mary Brandfass and Minnie
Grosscurth each two hundred dollars, which will was ad-
mitted to probate, and Charles F. Brandfass qualified as
executor; and that within a week after the death of William
Weidebusch, while the plaintiffs were in a weak and de-
pressed state of mind, caused by their father's death, and
in a condition to be easily influenced, Charles F. Brandfass,
conspiring and confederating with others unknown to
plaintiffs, for the purpose of fraudulently depriving plain-
tiffs of their rights under the will, went to the plaintiffs
separately, and presented a paper, which he requested them
to sign, making a redivision of the said real estate, differ-
ent from that made by the will, and releasing Mrs. Brand-
fass and Mrs. Grosscurth from the payment of the two hun-
dred dollars imposed on each of them by it for William Weid-
ebusch, and requiring Mrs. Schuttler to pay the whole seven
hundred dollars going to him, instead of only three hundred
dollars, and two hundred and seventy five dollars to be paid to
Mrs. Schupbach, giving as a reason for the execution of the
paper that the disposition made by the testator in his will of
his property was not just or equitable to the other children,
and that the will was not worth the paper it was written

on; and that unless they signed the said agreement, the property would have to be sold, which would involve a lawsuit, with no small expense, and it would have to be paid out of the estate; and that while he and others of the defendants so asserted that the will was worthless, they gave no reasons why it was, but concealed their reasons from the plaintiffs; and that reposing confidence in the business ability of Charles F. Brandfass, executor, and also in his integrity, and being ignorant themselves of business, and being hurried into the agreement without sufficient time to reflect or procure advice, and believing that Brand- fass, as executor, had authority to sell the property, if so disposed, they were, by all these means and under these circumstances, induced to sign said agreement, taking from them a large portion of the real estate devised to them by said will, greatly worsting their condition, which they would not have done but for being so induced, misled, and deceived; and that, under like influence and circumstances, they had shortly afterwards executed deeds carrying that agreement into execution. The court decreed the cancellation of the agreement and deeds, and the defendants appeal.

The question whether the facts justify the decree of rescission has been somewhat grave to me. The claim that the will was worthless, taken alone, was but the expression of an opinion, and no fraud in law, though untrue. Point 19, *Crislip* v. *Cain*, 19 W. Va. 439; *Wamsley* v. *Currence*, 25 W. Va. 543. Parties in controversy always persist in their claims, and have a right to do so, stating nothing false, concealing nothing which they ought to disclose; and, were we to hold the mere expression of opinion that a will or deed is void as a fraud to cancel an agreement, few acts of adjustment would stand. As to a threat of suit, the same may be said. It is not legal coercion or duress. *Whittaker* v. *Improvement Co.*, 34 W. Va. 217 (12 S. E. 507); Judge Green's opinion in *Simmons* v. *Trumbo*, 9 W. Va. 365.

Is the statement material that unless a redivision of the property should be made, it would have to be sold? It struck me as such. A sale would deprive Mrs. Schuttler and Mrs. Schupbach of the roofs sheltering their heads,

given as homes by their old father, to which their hearts were attached. The threat to sell them would be highly calculated to inspire them with fear and terror. Frequently, in their sworn statements, they say they would not have signed the papers if they had not feared a sale, and they thought the executor, Brandfass, had power to sell. Did Brandfass make this threat? On the occasion when the parties were present together and signed the agreement, either he made it or Mrs. Grosscurth made it in his presence. I interpret the evidence as saying he did so, and advised the parties all to sign it. Evidence is abundant to show that Mrs. Brandfass and Mrs. Grosscurth made this threat, and it would be naturally taken as inspired by Brandfass as expressive of his opinion of his power as executor. But it will be said there was the open will, and as it contained no power of sale, they were as well able to form an opinion as was he, and they were bound to know that by law he had no such authority, and can not plead their mistake of law as forceful in law, or allege that a statement of law even known to be erroneous would be fraud in those making it. *Haigh* v. *Association,* 19 W. Va. 792; *Harner* v. *Price,* 17 W. Va. 523; *Shriver* v. *Garrison,* 30 W. Va. 456 (4 S. E. 660); 8 Am. & Eng. Enc. Law, 636; Bigelow, Frauds, 487. "Ignorance of law excuses no one," is a maxim of public policy, and wise, and yet often operates to shield injustice and operate harshly on the innocent and ignorant; and hence the rule is guardedly laid down by the courts, leaving an open door that courts of equity may, in particular cases, not be shut out from the capacity to prevent real injustice. The rule is laid down in this Court in *Harner* v. *Price,* thus cautiously: "Agreements made and acts done under mistake of law are (if not otherwise objectionable) generally valid and obligatory." Story, Eq. Jur. § 120, says it is the rule, stripped of all other circumstances than mere mistake of law, but not where there is an admixture of other ingredients going to establish misrepresentation, imposition, undue influence, undue confidence, mental inability, or surprise. It does not operate, says 15 Am. and Eng. Enc. Law, 638, where the party has been led into the mistake of law by the misrepresentation

of the defendant, or he takes advantage of the other par-
ty's ignorance of law.

Such being the law, let us look at some of the facts:
Mrs. Schupbach, a widow woman, washing for a living,
wholly incompetent for business, especially ignorant of law,
uneducated.   Mrs. Schuttler likewise, and, though mar-
ried, her husband seems incompetent for business, and, if
capable of defending his wife's interest, his energy dulled
by the fact that he was in Brandfass' tobacco factory as a
laborer, and discouraged his wife from persisting in her
rights.  Brandfass, on the other hand, a man of very strong
intelligence, a good draftsman, engaged in manufacturing
and other prominent business.   While, as executor, he had
no power over the realty, yet, in the eyes of the complain-
ants, that would give him power over the estate.   He was
a brother-in-law.   He had been their father's counselor
and business man in his lifetime, and the counselor of the
family in trouble.   All shows that they had confidence in
him, and looked upon him as the business man of the fam-
ily, and that they regarded him somewhat with trembling
in this matter, on account of his superior attainments.
Mrs. Schuttler, as shown by several witnesses, when the
controversy was going on, was broken down from watching
at the bedside of her father, and was in a state of nervous
prostration.   She thus states her condition: "Answer.
Well, if you consider it fraudulent to take advantage of a
person when their health is broken down, then I do think
I was deceived, for I think that Mr. Brandfass and his
wife both knew the condition of my health; for, if ever
there was a time in my life that I needed a rest, it was the
week my father died, when they compelled me to sign
those papers."   The old man Weidebusch was buried Sat-
urday, and on Sunday the family read the will.   The par-
ties seemed satisfied with it.   But Sunday evening Mrs.
Brandfass, as the first one, expressed protest against it, and
was joined by Mrs. Grosscurth.   Then Mr. Brandfass and
his wife and Mrs. Grosscurth informed Mrs. Schuttler and
Mrs. Schupbach that the will was not worth the paper it was
written on; that it was unjust; that, if the matter was not set-
tled the will would be overthrown; and that the property

would be sold, and large costs incurred, and the lawyers get the cream. Then Brandfass, as he admits, originated the plan of re-division different from the will, drew the lines of it on a card, presented it Monday to his sisters-in-law, called a meeting Wednesday, and at that meeting drew up the agreement complained of, and they signed it. He had consulted a lawyer about the will, of which the two sisters-in-law were aware. There was not much time for these illiterate women to think or get legal advice. This redivision originated with Brandfass, and he presented it, and it may be fairly treated as his ultimatum. Pending this hasty procedure, the statement is made that the will is worthless, and will be overthrown, and the estate devoured with costs; whereas, on its face, it seems valid, and a great volume of evidence shows that the testator was competent. The statement is made that the property will be sold, whereas there was no shadow of authority in the executor to sell it. Brandfass repeatedly told Mrs. Schuttler and Mrs. Schupbach that his wife and Mrs. Grosscurth would not abide by the will. He advised them to sign the paper. They had confidence in him. If not moved by this, they likely thought, weak as they were compared with him, that they would be unable to cope with him. These circumstances would seem to show an admixture of other elements with mere mistake and misstatement of law, and deny the application of the rule above adverted to in this case. These female plaintiffs, by this agreement, conveyed away a very valuable fraction of what their father's will gave them, and for no consideration, and, so far as we can see from the case, without any call or reason of justice. Mr. Brandfass and his wife and Mrs. Grosscurth regard the will as unjust. Mrs. Schupbach was a widow, washing for bread. Mrs. Schuttler's house was the old man's home, and she watched his declining years and his dying bed. Good reason dictated this will; but, at any rate, the father had the right to do as he pleased.

In *Jordan* v. *Stevens*, 51 Me. 78, it was said: "Although there be no actual fraud, if one is unduly influenced and misled by the other to do that which he would not have done but for such influence, and has in consequence con-

veyed to the other property without any consideration, or purchased what was already his own, the court will, if it can be done, restore both parties to the same condition as before." And also held that "where the mistake is one of law, and there are other elements not in themselves suf- ficient to authorize a court of equity to interpose, but which, combined with such mistake, should entitle the party to relief, the court will afford it." (I remark, under this principle, that take all the features of the case togeth- er, and they justify relief.) The judge said, what is perti- nent in this case: "The parties were not on equal terms. The plaintiff was ignorant in business affairs, as well as in other respects. Having confidence in the defendants, she relied on what they told her. It does not appear she doubt- ed the validity of her father's lease until such doubts were communicated to her from them. The proposition for her to release her interest in all the other property did not ori- ginate with her, but with them; and she was induced to accept it by the fear which they impressed upon her that she otherwise would have to give up her homestead. She acted under their influence. She believed there was a de- fect in the first lease, and they meant to take advantage of it. As was said by the master of the rolls (afterwads Lord Kenyon) in *Evans* v. *Llewellyin,* 1 Cox, Ch. 333, "though there was no fraud, there was something like fraud, for an undue advantage was taken of her situation. The party was not competent to protect herself, and this court is bound to afford her such protection." In *Whelen's Appeal,* 70 Pa. St. 426, it is said: "In *Evans* v. *Llewellyin,* 1 Cox, Ch. 333, a conveyance was set aside, because it was improv- idently executed. Lord Kenyon remarked: 'The party was taken by surprise. He had not sufficient time to act with caution. He was not competent to protect himself, and we are bound to protect him.' The case of *Evans* v. *Llewellyin* supports this application to open the decree on the ground of haste in the execution of the agreement of distribution. The short time that passed after the death of Mr. Nevins, a little more than two months, makes the transaction a very uncommon one, showing unusual expe- dition in securing, by consent of parties, a division of the principal portion of the assets of the estate."

Another fact in the case, and important, is that while the threatening contestants of the will iterated and reiterated that it was worthless, and the property would be sold unless a specific compromise be made, they gave no wherefore, thus intimating to these two unprotected sisters that their adversaries knew something of magical force to defeat the will. Had they been told that it was the insanity or mental imbecility of their father, rendering it invalid, they would have been able to estimate its importance in weighing whether to accede to this arrangement proposed to them by Brandfass, but, until it was all closed, they were not told this. Why not tell them plainly? From the great mass of evidence showing his competency, likely they would at once have rejected this theory, had it been presented to their minds. They were enough acquainted with their father to know that. That required no keen acumen or knowledge of law. But it is said this is a family settlement, and family settlements are favored. I must remark here that there was really no settlement to make; no complication. All was given on one side; nothing on the other. But say that it was a settlement of a controversy in the family. 2 Pom. Eq. Jur. § 850, states the law to be that family settlements "will not be disturbed for ordinary mistake, either of law or fact, in the absence of conduct otherwise inequitable, since their very object is to settle all such possible errors without a judicial controversy. There are, indeed, *dicta* to the effect that a party will be relieved from a compromise in which he has surrendered property or other rights, unquestionably his own, through a misconception of a clear legal rule or an erroneous supposition that a legal duty rested on him, whereas, plainly, no such duty existed; but the decisions show that these *dicta* must be confined to circumstances which render the compromise itself a virtual surprise, or to cases in which it was induced by positive inequitable conduct of the other parties. Voluntary settlements are so favored that if a doubt or dispute exists between the partie with respect to their rights, and all have the same knowledge or means of obtaining knowledge concerning the circumstances involving these rights, and there is no fraud, misrepresentation, or concealment, or other misleading in-

cident, a compromise into which they thus voluntarily enter must stand and be enforced, although the final issue may be different from that which was anticipated, and although the disposition made by the parties in their agreement may not be that which the court would have decreed had the controversy been brought before it for decision. Of course, there must not only be no misrepresentation, imposition, or concealment; there must also be a full disclosure of all material facts within the knowledge of the parties, whether demanded or not by the others. In the words of a distinguished judge: 'There must not only be good faith and honest intention, but full disclosure; and, without full disclosure, honest intention is not sufficient.' If these requisites of good faith exist, it is not necessary that the dispute should be concerning a question really doubtful, if the parties *bona fide* consider it so; it is enough that there is a question between them to be settled by their compromise. The foregoing rules apply to all cases of compromise, whether the doubtful questions to be settled relate to matters of law or of fact." I will not recur to the facts in connection with this statement of the law to show that even if we look upon it with all the favor shown to family settlements, this law will not sustain this transaction.

Leaving now the agreement, we come to the deeds, made only twelve days after it was signed, to carry it into execution. Why did Mrs. Schuttler and Mrs. Schupbach go on with the matter? Why did they not, after the hasty signing of the preliminary agreement, look around them and stop? They did become dissatisfied with that agreement, and they went to two lawyers and a friend. This friend said it was not fair, that he did not think Mr. Brandfass would do such a thing, but he did not know what to think about it, and gave no advice or encouragement. One of the lawyers intimated the will was not good, saying nothing definite; and another said he did not see why Brandfass said the will was worthless, asked why they had not come to him before signing the agreement, and said that he was then busy, but come again next week, and he would examine the will, thus producing the impression on their minds, though not intentionally, that they had injured

their cause by signing the agreement. So, in fact, they received no advice. And here I note that they saw this attorney Saturday, and the day fixed for a second interview with the attorney was on the next Tuesday. Mrs. Schuttler went to Mrs. Brandfass' home on that Saturday, and informed her that she had been to see a lawyer, and that he had told her they could not do this thing, and could not sell the property. On the next Monday morning, we find Mr. Brandfass going to Mr. Taylor's, where Mrs. Schupbach was washing, and telling her to come to the title and trust company's office, and sign the deeds, when she cried, and told him that she did not think he or her sisters would treat her so, as she had to wash for a living, and depended on what her father had left her, and now they were taking it from her; whereupon he became angry, kept tapping her upon the shoulder, saying she knew how her two sisters wanted it, and, if she was not satisfied, he would get her brother to sign the agreement, thus intimating that a brother who got but a little under the will would attack it, and get a full share. She means that, by tapping her shoulder repeatedly, he meant to intimidate and frighten her; while he says he meant only to show his sincerity and emphasize the remark that she could sign or not, as she chose. Now, did he thus go to Mrs. Schupbach early Monday morning while at work, to hurry up the signing of the deeds, because he had heard from his wife that Mrs. Schupbach was in consultation with a lawyer? The deeds were signed by her that Monday. His interview with her seemed to have the desired effect. Thus, when the deeds were signed, these parties were under the impression that they were concluded by the prior agreement, and they had received no encouragement or advice, but discouragement. I will here quote from the opinion of the circuit judge, Paull:

"These facts of themselves, it seems to me, although there are other facts and circumstances disclosed by the evidence which should not be overlooked, constitute such a case of surprise, of undue pressure, and of inability on the part of the plaintiffs, under the circumstances then existing as should entitle them to the protection of a court of equity. This conclusion is not in any way in conflict with

the decision of the Court in *Harner* v. *Price*, 17 W. Va. 523-543, because in that case there was a mistake of law, while in this case there is a failure to disclose a material fact; nor does it conflict with the decision in *Korne* v. *Korne*, 30 W. Va. 1 (3 S. E. 17), because, when the instruments sought to be impeached in that case were executed, the parties to those instruments were all on equal terms, with knowledge, and with sufficient advice and protection, while in this case the plaintiffs had no knowledge, no advice, no protection, upon the one question on which knowledge, if not advice and protection, was of the utmost importance to them." I add the remark as to the case of *Korne* v. *Korne* that it lays down that "a compromise of a doubtful right fairly made" is binding, and can not be affected by later investigation or result, and this is so whether it is a compromise of a doubtful question of law or fact; and I ask, where is the doubtful right in a case where valuable estate is given up by parties unquestionably entitled, for no consideration whatever? May I not ask, was this compromise fairly made?

I will conclude this already too long opinion by saying that a circuit court, upon a mass of oral evidence, conflicting in many points, has decided the case for the plaintiffs, and we must be clearly convinced of error before we can reverse. And this decision is the more satisfactory, from the fact that it does but carry into effect the last will and testament of William Weidebusch, making such division of his worldly estate among his children as he thought proper. *Reger* v. *O'Neal*, 33 W. Va. 160 (10 S. E. 375).

I see no error in allowing an amended bill to be filed, and awarding the injunction. These points do not seem to be insisted on in brief of counsel.

An answer alleged that the judge, in passing on the case as made by the original bill, virtually decided the case for plaintiffs on the case as made by it, but added some remarks that the defendants may have believed the will worthless, but did not give the plaintiffs any reason for that opinion; and thereupon the plaintiffs amended their bill, charging facts not in their original bill, to conform to what the judge said. An exception to this matter of the answer was

sustained, and this is assigned for error. I do not think this matter was one proper to be alleged in pleading. To say nothing of the impropriety of alleging remarks of a judge in passing on a case, it is not proper to go into the pleading, but, if admissible, would be in its nature evidence to show that the new matter was never dreamed of by those alleging it until the judge made the remarks *arguendo*, and that the plaintiffs falsely inserted them in the amended bill. Under an answer denying their truth, the occurrence in court, if admissible, would be provable by evidence. It is mentioned, but merely mentioned, in brief of counsel.

We affirm the decree.