# CHARLESTON.

## PENNYBACKER *v.* LAIDLEY.

Submitted January 24, 1890.—Decided March 25, 1890.

1. RESCISSION OF CONTRACT—MISREPRESENTATION.

One of the fundamental principles in regard to fraudulent misrepresentation is, that the false statement must be believed by the party to whom addressed, otherwise however false, or however fraudulent the intent, the false statement does not constitute any ground for rescission of a contract.

2. RESCISSION OF CONTRACT.

Where parties deal at arm's length, and there is no confidential or fiduciary relation between them, mere silence on the part

of the purchaser of realty, or failure to disclose knowledge on his part of a peculiar value affecting the property, or the title thereto, would not be sufficient to set aside a sale fairly made, and which is otherwise unimpeachable.

3. RESCISSION OF CONTRACT—EVIDENCE.

The well established doctrine is that, where there is no actual fraud, and no confidential or fiduciary relations between the parties, mere inadequacy of consideration is not sufficient to rescind a sale, unless it be so great as to shock the moral sense of mankind.

4. RESCISSION OF CONTRACT—INADEQUACY OF PRICE.

The inadequacy above referred to, must be established as of the date of the contract, and if there were not, at that date, such inadequacy as has been described, none can be considered which may arise from subsequent enhancement, depreciation, or change of circumstances.

5. RESCISSION OF CONTRACT—CONTRACTS OF HAZARD.

In reference to contracts of hazard, the factor of risk and hazard is such a disturbing element in the estimation of value, that courts of equity, when inadequacy alone is in question, will refuse to interfere.

6. RESCISSION OF CONTRACT—MISTAKES.

There is no doubt that courts of equity will correct mistakes of the scrivener in drawing a deed, where he has not drawn it in accordance with the clearly established directions and instructions of the parties; but before a court of chancery will consent to correct a mistake in the terms of a deed, participated in by only one of the parties thereto, where no fraud or deception is practiced, and where a party of ordinary intelligence, who can read, has deliberately executed said deed, the proof of mistake, where admitted at all, must be strong, clear, preponderating and convincing to the mind of the court.

*J. B. Laidley, E. S. Doolittle, Brown & Jackson, O. Johnson, J. E. Kenna, J. A. Warth, J. W. Kennedy* and *W. E. Chilton* for appellant.

*J. H. Ferguson, Simms & Enslow, J. M. Layne* and *E. Gibson* for appellee.

LUCAS, JUDGE:

This was a suit instituted by bill in chancery in the Circuit Court of Cabell county, at the February rules, 1888, against the defendant John B. Laidley, and certain purchasers from him, who are charged with notice, for the purpose of setting aside, on the ground of fraud and mis-

take, a certain deed made by the plaintiff, on the 26th day of January, 1882, conveying two hundred and forty acres of land to the said John B. Laidley. The plaintiff alleges in her bill that in 1865, Rebecca J. Everett conveyed to her in fee a tract of 240 acres in Cabell county. The plaintiff alleges that at the time of the execution of the said deed to her she was a married woman, living with her husband John M. Pennybacker, and that the said deed vested a life estate in the said Pennybacker, by virtue of his marital right. That the said John M. Pennybacker took possession of the said land, enjoying the rents and profits thereof until the 25th day of February, 1870, when he bargained and sold the same (reserving one acre), to C. P. Huntington for $11,000.00, as this complainant is informed, conveying the same by a deed duly executed by him, the husband of this complainant, but which was never executed by this complainant, in the manner required by law to divest her of her title to said land, and which and in fact, conveyed only the life estate of her husband, John M. Pennybacker, but under which the said Huntington took possession of the said land. That her husband, John M. Pennybacker died in July, 1881. That in January, 1882, John B. Laidley, a practicing attorney, whom plaintiff had known for many years, came to her home in Huntington, and represented that she had a dower interest in said 240 acres of land. That she contended that she could have no interest in the land, having always been under the impression that all her interest had been conveyed to Huntington, and so told said Laidley, who then explained to her, *that under the new Constitution of West Virginia,* she had a dower interest in said land and proposed to bring suit to recover said dower, for one half thereof, but, should he lose said suit she must pay him for his services; which proposition she declined. That he called again and offered her $500.00 for the said dower, which offer she did not then accept, and that Laidley told her he would call again, and in the meantime she could consider the proposition, and consult her friends about the matter, but exacted from her a promise, "on the honor of a lady," that she would not consult a lawyer. That she consulted some of her friends, and being advised that she could have no such interest, and

being advised by them to do so, agreed to take the $500.00 for her said alleged dower; and accordingly on the 26th day of January, 1882, executed to said Laidley a deed which he had prepared and had presented to her, of the contents of which she was ignorant at that time, but supposed it to be, and understood it to be, a conveyance of the dower interest which said Laidley was pretending to purchase, but which was in fact an absolute conveyance of the said 240 acres of land. That at that time she was the absolute owner of said land, never having in any way parted with her title thereto; a fact of which she was then ignorant, and which the said Laidley cunningly and adroitly concealed from her. That the said tract of land, situated in the city of Huntington, was at the time it was conveyed to Laidley, worth at the very lowest estimate, $100,000.00; that she was then living within a few hundred yards of it, and well knew its value, and had she not been grossly misled and deceived by the said Laidley she would not have executed said deed. That said deed was obtained by said Laidley through the grossest fraud and misrepresentation; that the said consideration was wholly and entirely inadequate, and that said deed is void. The bill alleges a sale of part of said land to the defendant Campbell by Laidley, and that Campbell conveyed a part of his interest to the defendant Erwin; and charges they and each of them had notice of the fraud. The bill prays for cancellation of said deeds. The plaintiff filed an amended bill, in which she sets up her poverty and business inexperience. She reiterates the story of Laidley's representations to her, that she had a *dower* interest in the land, and that she sold only her dower interest to him. In this bill she says, that she was led to think she had a dower interest in the land. She further says she did not know the *legal effect* of the deed to Laidley, at the time she executed it. That she was not informed by Laidley, that there was any defect in the deed to Huntington. Says at the time she executed the deed she had no knowledge that the deed conveyed anything but a dower interest in the land; that Laidley at that time knew she was under that impression. That the representations made to her by the said Laidley, which induced her to execute the said pretended deed were false

and fraudulent, and made with the intent to deceive and defraud her, and did in fact deceive, mislead and injure her. That if she had at that time had any knowledge of the fact that she had any claim to the whole tract of land, she would not have sold it for the small sum received; that she did not at that time suspect there was any defect in the deed to Huntington, and never learned it until long after the deed to Laidley was executed, and Laidley had tried his suit in ejectment against the Central Land Company. That soon after she did discover the facts, and that it was supposed that the deed to Huntington was void, and that Laidley claimed the entire tract by virtue of her deed to him, and called on an attorney and employed him to bring this suit, and that as soon as she made necessary arrangements for fees and costs she instituted this suit. That her delay in bringing the suit arose from her ignorance of the facts in the case, and from her general lack of business experience. That she was too poor to pay an attorney a fee certain, but was compelled to hire the attorney on a contingency. She now prays that the said pretended deed of January 26th, 1882, to John B. Laidley be held to have been obtained by fraud and misrepresentation for a grossly inadequate consideration, and the same declared to be null and void, and the same set aside, and she in as far as she had title to the said land on the day she executed the same, be reinvested with the same, in the same manner as if she had never executed the said deed of January 26th, 1882.

She also prays that all such other further general relief may be granted her as to equity may seem fit, and the case require, and she will ever pray.

The defendant, J. B. Laidley, answered the bills, and denied every allegation therein, and avers that he told her the whole truth about the defect in the deed to Huntington, and wanted to bring a suit for her, to recover the land itself, which she would not permit, assigning as reason therefor, that if she brought said suit her son Mason, who was in the employ of the Railroad Company, would be discharged, and that it would take all she had to prosecute the suit, and then proposed to sell all her interest, and he offered $500, which, after consulting with friends, she accepted and made the

deed, upon his executing a contract to her that in the event her son was discharged by the company, he would provide him with employment.

He pleads laches, avers that she waited for nearly six years, saw him expending money in litigation that she refused to undertake, paying taxes on the land; and then, twelve days after he had succeeded, in the Court of Appeals, in reversing the judgment of the Circuit Court of Cabell county holding the deed to Huntington good, and having it declared void as to Mrs. Pennybacker, she brought the suit.

The answer insists that under these circumstances she has affirmed the deed, and is estopped to deny its validity. That in such a case the law requires that the suit should be promptly brought, and the money paid be returned.

The defendants Campbell and Erwin also severally answered, denying any knowledge of the fraud charged. Many depositions were taken.

The cause was removed to the Circuit Court of Kanawha county, and was heard on the 13th day of July last, and the court cancelled and annulled the deeds. From said decree this appeal is taken.

The first ground of error assigned by the appellant in this case, is that the Circuit Court erred in not sustaining the demurrer to the bill, and the objection to the filing of the amended or supplementary bill.

The comprehensive charge of the bill is that the deed for the land in question "was obtained by the defendant Laidley through the grossest fraud and misrepresentation; that the said consideration was wholly and entirely inadequate, and that the said deed is void both at law and in equity." Admitting this statement to be true, and considered in connection with other and more specific allegations of the bill, I think it contained sufficient equity to render it not erroneous to overrule the demurrer. The amended and supplemental bill was filed before the answers of the defendants, and was only an amplification and more particular specification of the charges contained in the original, together with other facts introduced by way of anticipation and avoidance of certain matters of defence, which the pleader supposed might be urged by the defendant. I see no valid objection to the fil-

ing of this amended bill, under our rules of pleading and practice.

The charges of fraud for which it is sought to set aside the deed of January 26, 1882, from the plaintiff to the defendant, may be classified under three heads, *First,* fraudulent misrepresentation as to the interest which the plaintiff had in the land conveyed: *Second,* fraudulent concealment of material facts within defendant's knowledge, but unknown to the plaintiff, and which, in good faith, the defendant was bound to communicate: *Third,* inadequacy of price, so gross as to shock the conscience, and cause an exclamation of inadequacy when communicated to any disinterested party, acquainted with the property.

I will say in the outset, that in the view I have taken of this case, I have not thought it necessary to discredit any of the witnesses on either side, although counsel on both sides have indulged in much criticism of the testimony of their respective opponents.

In regard to the first charge of positive misrepresentation, the gravamen is that the defendant Laidley persistently represented to the plaintiff that her interest in the land was a *dower* interest, which, according to the statement of one of her counsel in his brief, would only amount to about one fourth as much in value as the fee simple interest of entire ownership. This misrepresentation is denied by the defendant, but is testified to by the two daughters of plaintiff, and a lady friend then on a visit to plaintiff's house, where the interviews, three in number, were held between the two contracting parties, before the deed was signed.

Let us suppose the plaintiff's own testimony on this subject to be fully corroborated, and then analyze that testimony and see what influence it ought to have in sustaining the issue on the part of the complainant, as entitling her to have the deed annulled. One of the fundamental principles, in regard to fraudulent misrepresentation, is that the false statement *must be believed by the party to whom addressed,* otherwise, however false, or however fraudulent the intent, the false statement does not constitute any ground for rescission. Mr. Bigelow, in his admirable treatise on Fraud, page 521, thus lays down the doctrine:

"We have next to consider the rule that requires the party complaining of misrepresentation to show that he was ignorant of the truth of the matter concerning which the representation was made, and that he believed that the representation was true. In general both of these situations must be true of him; he must have been ignorant of the true state of facts, and must have given credit to the representation of them as made by the alleged wrong-doer. He must have been deceived; one who has knowledge of the truth, or without knowledge thereof makes examination for himself, or acts upon independent information, and not in a belief of the truth of the particular representation, is in the one case not deceived at all, and in the other is not deceived by the person of whom complaint is made."

To the same effect, Mr. Pomeroy (Eq. Jurisp. § 890): "Another element of a fraudulent misrepresentation without which there can be no remedy, legal or equitable, is, that it must be relied upon by the party to whom it is made, and must be an immediate cause of his conduct which alters his legal relations. Unless an untrue statement is believed and acted upon, it can occasion no legal injury. It is essential, therefore, that the party addressed should trust the representation, and be so thoroughly induced by it that, judging from the ordinary experience of mankind, in the absence of it he would not, in all reasonable probability, have entered into the contract or other transaction." And in a note to the preceding section, 879, after citing a great number of cases, the learned author thus concludes:

"In none of these cases, with one or two exceptions, was there the slightest suggestion of any interest to deceive on the part of the vendor; nor even an allegation that he knew of the wrong statement. The question of his knowledge, belief, or intent, was wholly immaterial, because the decision need not turn upon it. It is the fact of the other party's being misled, and not the design to mislead him, which constitutes the defence in this class of cases. It is apparent, therefore, that the language which judges have used concerning misrepresentations in such cases, should not be confounded with the terms which are employed in describing the elements of a misrepresentation in order that it may be fraudulent."

It will thus be seen that if Laidley stated to Mrs. Penny-
backer that she had only a dower interest in the land, and
thus deceived her, and induced a contract which otherwise
she would not have entered into, his mistatement, however
honest his intentions, would be ground for rescission; while,
on the other hand, if she knew the statement to be untrue,
and did not rely upon it, no matter how fraudulent his in-
tention, she can not claim, on this ground, to have her con-
tract rescinded.

Let us now apply these principles to her own testimony.
She testifies in chief:

"Mr. Laidley came to see me in January, '82, and asked me
if I remembered my husband selling the farm to the company
or C. P. Huntington. I told him I did, *then he told me that*
he had no right *to sell it off*, or if he did he should set aside
a part for a dower for me. I told him I couldn't see how I
had a dower, and he contended I had. *I told him that the
land was mine and that I couldn't see it that way;* then he said
under the new Constitution of West Virginia I had this dow-
er, and wanted me to bring suit for it. I refused to bring
the suit as my son was working for the company, and I had
no money to bring a suit with. Then he offered to bring
the suit for me, and if we gained it we were to go halvers, if
we didn't I was to pay him for his services. I positively re-
fused as that would take what little money I had. He then
asked me what I would take for the dower. I told him I
hardly knew. I told him if I had a dower I would take al-
most anything for it. He then gave me permission to advise
with any friends I might have, but bound me upon the honor
of a lady not to advise with any attorney. I went to see Mr.
Dickey, Uncle Lishe Mitchell, and they said they couldn't
see that I had a dower, and advised me to take the $500.00
that Mr. Laidley had offered me. I then accepted the $500.00.
Mr. Laidley offered me the $500.00 at the second interview."

This evidence in chief is followed by her cross-examination,
in which she adheres to her original statement, and effectual-
ly disproves any misconception on her part as to any right
of dower in the land.

Speaking of her own title to the land as derived from the
deed of Mrs. Everett, she says:

"Ques. 3d, Did the estate give you an estate in fee, or only an estate for your life or in dower? What interest did it give your husband in the land?

"Ans. It gave me possession of the whole farm. I don't know what interest it gave my husband.

"Ques. 4th. Did that deed give you a dower interest in the land in controversy?

"Ans. It gave me possession of the whole land; it did not give me dower."

And finally, on further cross-examination, she puts the whole question at rest, in the following unequivocal, and emphatic manner.

"Ques. 61st. Did you have dower in your own land?

"Ans. I didn't think I had, but you said I had under the new Constitution of West Virginia.

"Ques. 62d. Did you believe me, if I said that?

"Ans. No, I didn't believe you.

"Ques. 63d. Why did you not believe me, if I said that?

"Ans. My impression was a woman could only have a dower in her husband's estate.

"Ques. 64th. Did you have confidence in what I did tell you—did you trust me and rely on my judgment and advice?

"Ans. No sir, I did not.

"Ques. 65th. Upon whom did you rely—any one beside yourself?

"Ans. I asked advice of Mr. Dickey and Uncle Lishe Mitchell.

"Ques. 66th. Please answer the last question.

"Ans. Well, I did answer it.

"Ques. 67th. Please answer it again.

"*Ans.* I relied on their judgment and my own."

This then is the plaintiff's own testimony in regard to a matter as to which no one was so well qualified to testify as herself. She thoroughly disproves all reliance on her part upon Laidley's statements as to dower, or that she believed, or was misled by them. Upon the principles, therefore, which, as we have seen, are applicable to such cases, we must conclude that the plaintiff can not avail herself of any misrepresentation upon the subject of dower interest in the 240

acres sold. This disposes of the first charge of fraud, and having disposed of it, I shall not again recur to it.

The second charge is that of fraudulent silence, under circumstances which made it the duty of the defendant to disclose facts known to him, but unknown to the plaintiff.

Where parties deal at arm's length and there is no fiduciary relation between them, then mere silence on the part of the purchaser, or failure to disclose knowledge on his part of peculiar value belonging to the property sold, would not be sufficient to set aside a sale fairly made, and which is otherwise unimpeachable.

The doctrine is thus stated by Mr. Bigelow, in his work on the Law of Fraud p. 592. "The rule, too, by which a party to a sale of property is declared not to be bound to disclose circumstances within his knowledge which might affect the value of the property, applies as well to sales of real estate as to sales of personalty. A person who knows that there is a mine in the land of another, of which the latter is ignorant, may nevertheless buy it, without disclosing the existence of the mine. On the other hand the vendor need not undeceive the purchaser who may be buying under an impression (not derived from the vendor) that the land contains minerals of great value. Thus though a vendor of land, effecting a sale at an extravagant price, knew that the estimate of the value of the land formed by the purchaser was based upon his belief in the ability of a certain person to detect mineral veins by walking over the surface of the land, and though the vendor himself fixed a high valuation upon the land by reason of such supposed condition of the soil, this alone was held insufficient to relieve the purchaser from payment of the agreed price. The contract price is binding in the absence of false representations or acts of the vendor tending to cause or strengthen the false opinion upon which the purchaser has acted."

In the case of *Bank &c.,* v. *Campbell, &c.,* 75 Va. 455, involving the sale of the celebrated Luray Cavern property, the same doctrine is recognized as correct. That case, however, will illustrate the distinction between *mere passive silence,* and *active concealment,* which Mr. Bigelow insists upon. The vendees in that case, were held to have been

guilty of improper conduct in stating, after they had discovered the cave, that there was no cave there—only a "mudhole"—and in carefully obstructing and covering up the entrance, and the confirmation of the sale was rescinded. The Court however, states it as familiar doctrine: "That the purchaser is not bound to disclose his superior knowledge—no matter how acquired—of the property which he proposes to purchase, and that a mere concealment of such superior knowledge, without a fraudulent purpose, will not affect the contract, so as to cause a court of equity to set it aside merely upon that ground." See Pomeroy's Eq. § 926, 927.

There are, it is true, exceptions to the general rule; and it may be freely acknowledged that it is impossible to reconcile the cases upon this subject. I do not know of any exception under which this case can properly be brought. There is no evidence of want of capacity on the part of the plaintiff, although something is said of it in the bill, and arguments of counsel. Her depositions, and the management of her affairs as disclosed in this suit, show intelligence above the average.

But even should we be wrong in supposing that Laidley was not bound to communicate to her the defective acknowledgment, there is another proposition of law of universal application, which we should have to consider, before reaching the conclusion that she is entitled to a rescission. The rule is that he who alleges fraud, must prove it. The supposed exceptions to this rule are more apparent than real. There may be *prima facie* fraud, or the evidence may be circumstantial. *Goshorn* v. *Snodgrass*, 17 W. Va. 717. Nevertheless, so long as the scales are evenly balanced, the defendant against whom fraud is alleged must prevail; *Harden* v. *Wagner*, 22 W. Va. 356, syl. 9 and 10. Bigelow on Fraud, 127–128. Let us then see how the proofs stand in regard to the silence of the defendant. He swears positively that he pointed out to plaintiff the defective acknowledgment, and gave her his opinion as a lawyer that the deed was void or ineffective. Mrs. Pennybacker contradicts this. Miss Saunders was not present at all the interviews and was not competent to speak therefore, as to what took place, or may have occurred, when she was absent. She

says: "Ans. I was present when he made the propositions. I was present at most of their interviews but did not hear the conclusion they come to. I wasn't present at all of their interviews. I was only present at a couple of them. I did not hear the conclusion."

The two daughters, Mrs. Ferguson, and Mrs. Walstrum give versions of the various interviews—they being present at all of them—which negative the explanation of the defective acknowledgement which Mr. Laidley says he gave to the plaintiff. Under the rules of evidence, the plaintiff is precluded from proving her own declarations to third persons, as to what occurred at these interviews between Laidley and herself. He, however, is at liberty to prove her admissions as to what took place, and he does prove by several disinterested witnesses that she admitted, about the time of these transactions, that Mr. Laidley informed her that there was some defect about the deed, and that she could get her land back.

Upon this subject, A. P. Mitchell deposes as follows:

"A. I believe she claimed that Mr. Laidley said he could set the deed aside, I told her to take the $500.00.

"Q. 12. Did she then and there tell you what proposition John B. Laidley had made to her in reference to said land, if so what were *they* ?

"A. He said he would give her five hundred dollars for the land.

"Q. 13. To what deed do you refer in your answer to question No. 11 above?

"A. The deed from Rebecca Everett to John B. Pennybacker.

"Q. 14. What deed was it that Mrs. Pennybacker said that J. B. Laidley had told her he could set aside ?

"A. The deed to the Central Land Company or C. P. Huntington.

"Q. 15. Did Mrs. Pennybacker ask your advice about selling to J. B. Laidley.

"(Question objected to by Attorney J. M. Layne as leading and a repetition of the one already asked.

"A. Yes sir.

"Q. 16. Did Mrs. Pennybacker say anything about dower in that conversation ?

"(Question objected to for the same reasons last above noted.)

"A. No sir.

"Q. 17. Did she say anything about dower in any conversation before she sold to J. B. Laidley?

"A. No sir."

The testimony of Buffington is to the same effect:

"Q. Please state if you have had any conversation with H. S. G. Pennybacker, in relation to her sale and conveyance of the land in controversy to John B. Laidley, if so state when, where, what it was and what were the circumstances?

"A. Yes I have. I think it was a few days after John Laidley first mentioned it to her she told me that he had been out to see her, and said that he could get the farm back for her or something to that effect. I don't remember the exact words. Either at this or a subsequent conversation, she told me that he would take the case as an attorney and get it back for a certain portion of it—I think it was half or a certain portion of the farm—or that he would give her so much for her claim, I think it was $500.00. I think that was about the sum and substance of it. I recollect that she mentioned that Laidley requested her not to mention the matter to another attorney or employ another attorney, that as he had found it he ought to have it, if there was anything in it he ought to get it. I had several conversations with her, at different times and some of this may have occurred at the second or other conversations, she asked my advice, she asked me what I thought about it, I told her that I didn't feel capable of giving her advice in the matter and that she had better ask her uncle Mr. E. T. Mitchell or Arthur Mitchell, her cousin, that I thought the land was justly belonging to the Central Land Company as they had bought and paid them for it, and that if John Laidley was foolish enough to give her something for nothing, she had better take it. I think that was all the conversation as far as I recollect it now.

"Q. 4. At the time of these several conversations did you know that the land in controversy formerly belonged to Mrs. Pennybacker, and that she and her husband had conveyed it to C. P. Huntington and the latter to the Central Land Company?

"A. I always understood that Mrs. Pennybacker's money bought this farm originally, but did not know it of my own knowledge, as I had also understood that the land had been sold to the Central Land Company they paid taxes on the same and I supposed it was theirs.

"Q. 5. How did Mr. Laidley propose to recover the land back or what was his grounds for his suit?

"Question objected to as leading suggesting the answer, and illegal and improper.

"A. Some defect about the deed I don't know what it was.

"Q. 6. From whom did you first get this imformation?

"A. I got it from Mrs. Pennybacker, I had never heard anything about it till she mentioned it to me.

"Q. 7. From whom did she get her information about the defect in the deed? State her language as near as you can.

"A. I don't know who told her, from the conversation I supposed that John Laidley told her."

To the same effect is the testimony of Jennie Donnella. Here then are three witnesses, at least, to sustain by positive testimony the evidence of Laidley, that he did inform her that the deed by which she conveyed the land to Huntington was defective, and could be set aside. This is much stronger than mere negative testimony, and it seems to me that the scales, so for from being even, do largely preponderate upon the side of defendant.

I do not think that Laidley was bound to disclose to the plaintiff that the deed was defective; but had his silence upon this subject been under the circumstances, fraudulent, I do not think the plaintiff has proved that he failed to disclose the defect, but on the contrary, he has by a preponderance of evidence established that he informed her, in general terms at least, that the deed was defective.

The counsel for appellee have indulged in sharp criticism of the witnesses for the defendant, and commented upon the fact that several of them were *cousins* of Laidley; but if *relationship* were a discrediting circumstance, the fact would bear with still more force against the case of the plaintiff, which rests almost exclusively upon the testimony of herself, and *two daughters.* But, as I have said, I have not felt that it was

necessary to discredit any of the witnesses. Where there are direct contradictions, it is more charitable to suppose that, after a lapse of six or seven years, the infirmities of human memory may be credited with much diversity of recollection on the part of those who testify as to the same transactions.

I come finally to consider the third ground alleged as a badge of fraud, namely, inadequacy of price or consideration.

The counsel on both sides, have discussed this question with great elaboration, and marked ability. I do not find that there is any difference of opinion between them as to the doctrine itself, the point of departure between them being the question of application to the facts of this case.

The well established doctrine seems to be that where there is no actual fraud, and no confidential or fiduciary relations between the parties, mere inadequacy of consideration is not sufficient to avoid a sale, unless it be so great as to shock the moral sense. *Mayo's Ex'r. &c.*, v. *Carrington's Ex'r. &c.*, 19 Gratt. 74.

This is the doctrine announced by Lord Thurlow, Lord Eldon, and others in the earlier English cases, and which is generally recognized in the courts of this country. Perhaps nothing more satisfactory can be said on the subject than is said by Mr. Pomeroy, § 926.

"The doctrine, however, is now settled that *mere* inadequacy—that is, inequality in value between the subject-matter and the price—is not a ground for refusing the remedy of specific preformance; in order to be a defence the inadequacy must either be accompanied by other inequitable incidents, or must be so gross, as to show fraud. In short inadequacy as a negative defence, and as an affirmative ground for a cancellation, is governed by one and the same rule." Pomeroy's Eq. § 926. In the following section, the learned author adds:

"The fact that a conveyance or other transaction was made without professional advice or consultation with friends, and was improvident, even coupled with an inadequacy of price, is not of itself a sufficient ground for relief, provided the parties were both able to judge and act independently, and upon equal terms, and fully understood the nature of the transaction, and there was no undue influence or circumstance of oppression.

A single addition as a qualification to the above would make it cover the whole ground upon this subject, and that is, that the inadequacy must be established as of the date of the contract, and if there were not, at that date, such inadequacy as has been described, none can arise from subsequent enhancement, depreciation, or change of circumstances. *Hale* v. *Wilkinson*, 21 Gratt. 75, *Mortimer* v. *Capper*, 1 Bro. Ch. 156.

The only question which we have to consider, therefore, in this connection, is whether Mrs. Pennybacker's claim to the land in dispute was so cheaply purchased, at the time and under the circumstances, that the inadequacy of price shocks the moral sense of mankind?

The most accurate and intelligent witness who testifies as to the actual value of the property estimates it at $107,000.00; while another witness places the value as high as $350,000.00. Should we average these estimates, it would place the value at about $230,000.00.

Had the plaintiff been in possession of this property, or any considerable portion of it, with a good title, I think the universal conscience of mankind would have been shocked at a sale for such a trifling sum as $500.00, the price actually obtained. But what, in reality, was the plaintiff selling in this case, and for what was the five hundred dollars paid?

She was out of possession, and possession, it was morally certain, not only could not be delivered, but could not be obtained without litigation. The sale undoubtedly was a sale of what under the Revised Code of Virginia would have been prohibited by law as the sale of a *pretensed* title. 1 Rev. Code, Ch. 103, p. 375. The plaintiff was out of possession and had sold her land to Huntington, and received the then full value of $11,000.00. The defect in the certficate of acknowledgment consisted in the omission of two words—" *declared she* "— and with these supplied, the certificate would have been good. Although the question is now settled, and properly settled by this Court, that this slight omission was fatal under our statute, yet before the decision, the profession would perhaps have been about equally divided as to the materiality of the omission.

Had Mrs. Pennybacker gone to the senior counsel who now represents her, a lawyer of eminent ability, and national reputation, under whose inspection, as a part of our Code, this very act must have passed, and who was, therefore, peculiarly well qualified to pass upon its requirements—what would he have told her? He would undoubtedly have told her that the act had been substantially complied with, and that she had no interest to sell, and, therefore, that in obtaining $500.00 she was making a good bargain.

To use the language of his able and exhaustive brief in *Laidley* v. *Land Co.*, 30th W. Va. 505, he would have told her, "This is, beyond question, the *equivalent* of the *acknowledgment* and *declaration* prescribed by the statute, and a *substantial* compliance therewith, under the decisions of the Court of Appeals of Virginia, in the cases of *Hairston* v. *Randolphs*, *McClanahan et al* v. *Siter, Price & Co.*, and *Grove* v. *Zumbro.*" And further—" that the certificate of the acknowledgment of *Mrs. Pennybacker*, of the deed in question complies *substantially* with the requirements of the statute."

Moreover, the gentleman who was, as she testifies, her usual counsel, would have told her the same thing, as we learn from his brief in the said case. She was, then, selling a *pretensed* title, the value of which depended upon its validity, and its validity depended upon the critical construction of a peculiar, and highly artificial statutory enactment. A strictly business man would not have purchased at all, while a speculator would have given more or less according to his genius for speculation. It is difficult to conceive of a transaction more completely filling the definition of a *contract of hazard*. In reference to such contracts, the element of *risk* or *hazard* is such a disturbing element in the estimation of value, that courts of equity, when inadequacy alone is in question, will refuse to interfere. *Perkins* v. *Gray*, 3 S. and R. (Pa.) 327; *Smith* v. *Evans*, 6 Bin. 102.

Much practical light is thrown upon this question of value by subsequent dispositions of the same property, under circumstances not more unfavorable. Mr. O'Beirne seems to have purchased one half of Mrs. Pennybacker's interest for a consideration which the bill and deed would lead us to believe was entirely contingent. Mr. Pardee has purchased

the other half, for which he has "agreed to pay" not less than $3,500.00 nor more than $4,000.00." Mr. Laidley has sold one third interest for $500.00; while his vendee has sold one eighteenth for $245.00. These sales sound more like sales of shares in a lottery, than transfers of unincumbered real estate.

Had the interest of either litigant been thrown on the market on the first day of this term, I am satisfied that the price obtained would have depended not so much on the value of the subject matter, as upon the speculation as to the final result of litigation, which may yet be indefinitely prolonged; for although the defendant commenced his action for possession soon after his purchase, nevertheless, as appears by the record, he has not as yet succeeded in ejecting his adversaries from any of this land, or in gaining possession of one acre of it himself.

I am satisfied that this is not a case of such gross inadequacy of price, unaffected by questions of risk, hazard, and speculation, as ought to influence a court of equity to set aside the contract on the ground of fraud.

There remains but one further charge in the bill, which I deem it necessary to consider. It is claimed that the plaintiff executed the conveyance of January 26th, 1882, under a *mistake* as to the character of the conveyance, she supposing that it conveyed only her "*dower*."

There is no doubt that courts of equity will correct mistakes of the scrivener in drawing a deed, when he has not drawn it in accordance with the clearly established directions, and intentions of the parties. *Alexander & Co.* v. *Newton etc.*, 2 Gratt. 266. Or where there is a mutual mistake as to the interest of the vendor in the land sold, a court of equity may, to subserve the ends of justice, set aside the sale. *Irick et ux.* v. *Fulton's Ex'rs.* 3 Gratt. 193.

So where any deception has been practiced, and the direction being to draw a deed for one purpose, it is fraudulently drawn for another, and the deceit is not discovered until after execution. *Shepherd* v. *Henderson*, 3 Gratt. 367.

But in all these cases, where a court of chancery will consent to correct a mistake in the terms of a deed, participated in by one party only, where no fraud or deception is practiced,

and where a party of ordinary intelligence, who can read, has deliberately executed said instrument, the proof of mistake, where admitted at all, must be strong, clear, and convincing to the mind of the court. *Allen* v. *Yeator*, 17 W. Va. 128; *Korne* v. *Korne*, 30 W. Va. 1. In this case, there is no such proof. To establish a mistake, we have only one witness besides the plaintiff, and that is her daughter, Mrs. Ferguson. On the other hand, we have the testimony of Mr. McCullough, who, as notary, took her acknowledgment, and that of some three or four other witnesses, who testify that Mrs. Pennybacker admitted to them that she had sold her interest in, or claim to the land in controversy to Mr. Laidley for $500.00. I do not think there is any such clear positive, preponderating evidence of mistake in this case, as ought to induce a court of equity to rescind a contract, or set aside a deed. I am entirely convinced from the testimony that Mrs. Pennybacker did not believe that her title was maintainable, or of any value, and that thus skeptical of its value, she was willing to accept $500.00 for an entire relinquishment and transfer, provided she were protected against a general warranty of title, which was done by a contemporaneous writing which she could not have misconstrued. Hence she accepted, and presumably required, this guaranty against her general warranty as contained in her deed. To suppose her ignorant of the meaning of all these papers which she executed, or received, would be to discredit the evidence of the whole record, which directly, or indirectly, establishes the fact of her mental capacity.

Upon the whole, I am well convinced, if we were to rescind and set aside the deed of January 26, 1882, upon the case which the proofs present, that almost every title in the State dependent upon the conveyance of a widow, could be successfully assailed.

The decree reversed, and bill dismissed.

REVERSED.

BRANNON, J. Dissented.