# CHARLESTON.

WHITTAKER *v.* SOUTHWEST VA. IMPROVEMENT CO.

\* (HOLT, JUDGE, absent.)

Submitted September 10, 1890.—Decided November 28, 1890.

1. RESCISSION OF CONTRACT—FRAUD.
   To annul a contract for fraud, the fraud must be clearly proven.

2. RESCISSION OF CONTRACT—DURESS.
   A threat to bring a civil suit to enforce the execution of a deed for land, unless a party make such deed, will not constitute such duress as will avoid such deed.

3. RESCISSION OF CONTRACT—FRAUD—LACHES.
   He who elects to set aside his contract for fraud, must bring suit for the purpose, without unreasonable delay, after discovery of the fraud, unless there be good reason to excuse it; otherwise his delay will deny him relief.

4. DEMURRER—PRACTICE.
   The defence of laches may be made by demurrer, when the facts manifesting it appear in the bill.

*Johnson & Hale, A. W. Reynolds* and *J. S. Clark* for appellant.

*Johnson & Hale* and *Reynolds* cited:
95 U. S. 157; 1 Pom. Eq. Juris. §§ 418, 419 and n.; 79 Va. 468; 43 N. J. Eq. 323; 82 Va. 383; 77 Pa. St. 228; 99 Pa. St. 295; 44 Pa. St. 14; 8 W. Va. 410; 18 W. Va. 140; 21 W. Va. 469; 23 W. Va. 100; 30 W. Va. 182; 31 W. Va. 576; 83 Va. 451; Id. 504; 93 U. S. 55; 83 Va. 504, 510; Strong *v.* Strong, 102 N. Y.; Harr, Ch'y Rep. 102; Walk. Ch'y Rep. 373; Id. 186; 31 Ind. 14; 14 Ind. 49; 89 Ind. 38; 36 Ill. 396; 75 Pa. St. 173; 77 Pa. St. 228;

| 34 | 217 |
|----|-----|
| 36 | 55 |
| 36 | 135 |
| 34 | 217 |
| 38 | 625 |
| 34 | 217 |
| 39 | 122 |
| 34 | 217 |
| 41 | 203 |
| 41 | 274 |
| 41 | 582 |
| 34 | 217 |
| 42 | 16 |
| 42 | 792 |
| 34 | 217 |
| 43 | 153 |
| 43 | 561 |
| 43 | 579 |
| 34 | 217 |
| 44 | 687 |
| 45 | 307 |
| 34 | 217 |
| 46 | 414 |
| 46 | 418 |
| 34 | 217 |
| 47 | 309 |
| 34 | 217 |
| 49 | 646 |
| 50 | 361 |
| 34 | 217 |
| 51 | 617 |
| 51 | 638 |
| 34 | 217 |
| 53 | 547 |
| 34 | 217 |
| 56 | 332 |
| 34 | 217 |
| 59 | 249 |
| 59 | 252 |
| 60 | 266 |
| 34 f63 | 217 78 |
| 34 f65 | 217 125 |
| 65 | 131 |

---

\* Case submitted before Judge Holt's appointment.

Sto. Eq. Pl. § 251; 52 Ala. 282; 64 Am. Dec. 661; 1 Par. Con. 393; 59 Mo. 125; 2 Wis. 261; 1 Conn. 354; 6 Mass. 511; 23 Peck 167; 8 B. Mon. 11; 10 N. H..497; 58 Ind. 143; 64 Mo. 43; 78 N. C. 603; 9 W. Va. 369; 31 Gratt. 379; 64 Am. Dec. 661; 40 Am. Dec. 435; 58 Pa. St. 136; 5 Wait Act. & Def. 483, 485, 521, 522, 524; 4 W. Va. 397; 5 W. Va. 301; 58 Am. Dec. 448; 50 Am. Dec. 675; 3 Wait Act. & Def. 470, 471, 472, 473, 483; 79 Va. 468; 43 N. J. Eq. 323; 17 W. Va. 717; 26 Am. Dec. 370; 2 Kent Comm. 453 s. p.; 6 Am. Dec. 241; 24 Am. Dec. 274; 17 Wall. 67; 7 McCord Ch'y 36; 2 Ired. 365; Jarm. Wills 52; 84 Am. Dec. 97; Shelf. Sun. 37; 20 Gratt. 147; 15 Am. Dec. 354; 11 W. Va. 584; 21 Gratt. 75; 22 Gratt. 894; 8 Wall. 14; 3 Pom. Eq. Jur. § 928 *et seq.;* 2 Pom. Eq. Jur. § 917 and notes.

*P. W. Strother* for appellee cited:
Unis *v.* Charleston, 12 Gratt.; Fant *v.* Miller, 17 Gratt.; 3 S. E. Rep. 20; 11 S. E. Rep. 39; 32 Gratt. 300–302; Rover Iron Co. *v.* Tront, 83 Va.; 77 Va. 445; Cohn *v.* Roberts, S. W. Rep. 665; 10 S. E. Rep. 891; 20 W. Va. 415; 11 S. E. Rep. 227; 10 S. E. Rep. 568; 8 S. E. Rep. 74; 2 Pom. § 1405; 3 Pom. 310; 8 S. E. Rep. 749, 751, 753; 8 S. E. Rep. 408; Hairston &c. 81 Va.; Pom. §§ 1275, 1290; 3 Pom. 313, 747, 751; 8 S. E. Rep. 447, 449; Story Eq. 92; 31 W. Va. 736; 11 S. E. Rep. 220; Pom. Con. § 411; 3 S. E. Rep. 17, 122; 10 S. E. Rep. 240; 2 Pom. Eq. Jur. § 1405; 1 Munf. 578, 726; 2 Ves. Sen. 627; 11 S. E. Rep. 117; 2 Tuck Comm. 422, 423; 77 Va. 540; 78 Va. 65; 26 Gratt. 273; 79 Va. 356; 76 Va. 594; 32 Gratt. 302; 26 Gratt. 467; 77 Va. 525; 2 Pom. Eq. 892; 11 Gratt. 459.; Statham *v.* Ferguson, 25 Gratt.; 11 Pom. Eq. Jur. 417, 422 & n., 948, 951 n.; 1 Story Eq. 239; 17 W. Va. 472; 77 Va. 525; 6 Eng. & Am. Ency. 80; 2 Tuck. Comm. 422, 424, 425; 8 S. E. Rep. 74 n.; 4 S. E. Rep. 902; Id. 581; 3 S. E. Rep. 769, 894; 79 Va. 466; 2 Pom. Eq. Jur. 430 & n.; 8 S. E. Rep. 449; 9 S. E. Rep. 930; St. Eq. 189; 80 Va. 310; 22 W. Va. 593; 17 W. Va. 717; Moore *v.* Ulman, 80 Va.; 17 W. Va. 770; 28 W. Va. 803; 3 Munf. 130; 9 S. E. Rep. 934; 6 Am. & Eng. Ency. 33;

Kerr Fraud 300; 2 Pom. Eq. Jur. 417 n., 472, 497, 817, 818; 24 Gratt. 164; 13 Gratt. 362; 36 Fed. Rep. 147; 33 Fed. Rep. 314; 9 S. C. 598; Id. 277; 23 Gratt. 321;

*Payne & Green* for appellees cited:
1 W. & T. L. Cas. Pt. II, 952, 953; Id. 1263; 31 W. Va. 736; 33 W. Va. 738; 4 Wheat. 224; 14 Pet. 82, 83; 2 Pom. Eq. Juris. § 487, 895, 917; 94 U. S. 506; 95 U. S. 157; 79 Va. 468; 43 N. J. Eq. 323; 82 Va. 383; 8 W. Va. 410; 18 W. Va. 140; 21 W. Va. 469; 23 W. Va. 100; 30 W. Va. 182; 31 W. Va. 576; 83 Va. 451; 93 U. S. 55; 83 Va. 504; 31 Ind. 14; 14 Ind. 49; 89 Ind. 38; 38 Ill. 396; 81 U. S. 332; 9 W. Va. 367; 7 Wall. 216; 16 Wall. 432; W. & T. L. Cas. 1247; 4 S. E. Rep. 902; 6 N. E. Rep. 788; 7 S. E. Rep. 189; 5 Hill 154; 18 Md. 305; 2 Blatchf. 249; 26 Am. Dec. 374–378, note on p. 376; 64 Mo. 43; 10 N. H. 497; 9 W. Va. 369; 3 Gratt. 330; 6 Gratt. 684; 31 W. Va. 736; 28 W. Va. 773; 107 U. S. 262; 17 W. Va. 770; 80 Va. 310; 79 Va. 65; 1 W. & T. L. Cas. P't II, 952, 953; 2 Pom. Eq. Juris. §§ 467, 468, 471, 472 n., 487; Poll. Cont. 524, 539, 540, 563; Sto. Eq. Juris. (8th Ed.) § 239; 2 W. & T. L. Cas. P't II, 3196; 11 S. E. Rep. 406; 2 Tuck. Comm. 423; 25 Gratt. 28; 113 U. S. 89; 4 Otto 506; 78 Va. 146, 147; 80 Va. 22; 78 Va. 138; 4 How. 561; 80 Va. 30; Id. 805; Bisp. § 206; 79 Va. 118; Id. 150; 3 Waite Act. & Def. 439, 472, 473; 31 Gratt. 411, 412; 2 W. & T. L. Cas. P't II, 1263; Pom. Cont. 290, 292, 293, 306, 308; 7 W. Va. 392; Pom. Eq. Juris. § 892; 64 Am. Dec. 662; 75 Va. 460; 78 Va. 65; 32 Gratt. 300; 13 Pct. 26; 31 Gratt. 418; 1 Sto. Eq. Juris. 206, 208, n. 1.

BRANNON, JUDGE:

This is a chancery suit brought in the Circuit Court of Mercer county by William Whittaker and Eliza his wife, against the South West Virginia Improvement Company and others, to set aside on the ground of fraud an option made by Eliza Hale, later Whittaker, to John Graham, Jr., giving Graham option to purchase right to minerals in a tract of four hundred acres of land lying in Mercer county and Tazewell county, Va., and a deed made by said Eliza

Hale and John Graham, Jr., conveying such right to Joseph I. Doran, who conveyed to said company. A decree was pronounced annulling the deed from Eliza Hale to Joseph I. Doran; and from this decree said company has appealed to this Court.

I shall consider the case first as regards the option; for, if there be no ground for annulling it, the deed made under it, so far at least as it merely executes the option, would be wholly unaffected by the fraud, if any, connected with the execution of the subsequent deed; or the circumstances relied upon to show fraud as connected with the deed should be viewed in a different light—a light more favorable to the defendent than if there had been no valid option.

What then are the grounds on which we are asked to overthrow the option? The charge is that Dr. James O'Keefe went to the house of Eliza Hale, then a widow, to purchase the minerals in the land, stating that they were of but little value and would never be of any more value, unless there was railroad transportation for the coal, and that might be ninety years, there being no immediate prospect at that time of such road, though he was the agent of John Graham, Jr., chief engineer and projector of a railroad then under construction, which he, O'Keefe, and those for whom he was acting knew, but of which Eliza Hale was ignorant; and, induced by the concealments and representations of O'Keefe, she signed a paper, which she afterwards learned was such option, the same not having been read to her, agreeing to sell the mineral rights of said land at seven hundred and twenty dollars; but that in the mean time she ascertained that the railroad, which was to be postponed for ninety years, was in process of construction, and in the fall of that year the cars were running to East river and up the same; and that she had also been told by a practical miner not to sell, as the lands were worth one hundred dollars per acre instead of one dollar and eighty cents; and that it was then worth one thousand dollars per acre. The bill alleges that said Eliza "has little or no knowledge. Raised chiefly in the mountains of West Virginia, she had not the educational advantages of more favorably situ-

ated ladies." These allegations constitute the length and breadth of the cause, for which the option is attacked.

Now, as to the statement of the value of the minerals. It was matter of opinion. The evidence discloses that theretofore they had no value, and this was matter of opinion of which Mrs. Hale, from long residence there, was equally competent to judge. Next, as to the coming of the railroad, for in this matter consists the pith of the assault upon the option. The bill says that O'Keefe said the railroad might be delayed ninety years, and that there was then no immediate prospect of it, while in fact the railroad was then under contract and construction, and that he knew it, but she did not. If the road was then under construction there or anywhere near there, it is strange that she was ignorant of it. We all know that so important a matter as the construction of a railroad, especially in our mountain sections till then utterly without railroad, is a matter from the very first step during the preliminary surveys and during construction universally talked of, there being no subject of more wide-spread interest. She herself, while averring in her bill such ignorance, does not on the stand say she was ignorant of the events and occurrences touching the important work then going on towards the construction of this railroad which was to redeem that section from the wilderness.

The evidence shows that the New River railroad was begun in 1879, and it was not very far from this land and pointed in its direction, and the survey was made up East river, and the road let to contract in July or August, 1881, to Pocahontas, a few miles from the land. The surveying must have been going on before or as early as the 19th of April, 1881—the date of the option. How can we say that she did not know of this surveying, and of all the railroad construction and railroad enterprises then going on in that section? It is hardly to be credited in the face of these things, that she was wholly and solely influenced to sign the option by the declaration or opinion of O'Keefe that the railroad might be delayed ninety years. Anyhow, as she states it, it was in the garb of an opinion merely, as it must have appeared to her. And in view of the fact, which

she states in her bill, that he had applied to her in vain several times before to buy the land, and the fact that options on many neighboring lands were being taken, she had reason not to rely on such statement, but to suspect and believe to the contrary. A representation to vitiate a contract must be false, and be confided in also. And the statement by O'Keefe, that the railroad might be delayed, may have been the expression of an honest opinion, for it is not positively shown that he knew the road would certainly be built; and such enterprises are problematical, and subject to many vicissitudes. O'Keefe, as a witness, says that in the work of taking contracts, in which he was then extensively engaged in that section, he told every one that if they could buy coal lands low, they would build a railroad, but did not know when, and he supposes he told her what he told all others. He means to say that that was what he told her, and not that he told her the road would be delayed ninety years. So he denies this charge. If he did not make a false statement, he was not bound to tell her the railroad would come, even if he knew it. The mere fact of his knowledge, and her ignorance, of the coming of the railroad would not destroy the agreement. *Harris* v. *Tyson*, 24 Pa. St. 347; Kerr, Fr. 96. The evidence is not sufficient to overthrow the option for fraud. When fraud is relied on to set aside a contract, the evidence must clearly establish it. *Vanbibber* v. *Beirne*, 6 W. Va. 168; 3 Wait, Act. & Def. 445; *Smith* v. *Beatty*, 2 Ired. Eq. 456; *Crebs* v. *Jones*, 79 Va. 381; *Houghton* v. *Graybill*, 82 Va. 573. Though a party charged with fraud may not have been perfectly clear in dealing, no relief can be had, unless fraud is strictly and clearly proved. *Hord* v. *Colbert*, 28 Gratt. 49.

As to inadequacy of consideration it may be said, that there is no doubt under the evidence, that the price tested by the state of things up to and at the date of this option was a fair price. Many other options for lands in the vicinity were taken about that time at even lower rates. Indeed until the change wrought by the construction of the railroad wild lands commanded no greater price, generally not so great, for the soil itself not merely the minerals. A magical appreciation may have been brought about in the

"boom" following the construction or the certainty of the construction of the railroad; but these options were taken, and generally are taken, in advance of construction, and in most instances promote, and indeed are the only means of securing, railroad development; and if we say that contracts of this character between parties able and willing to contract, based on consideration reasonably adequate prior to and at the time of their execution, shall be defeated, merely because such consideration appears inadequate in comparison with prices, which the same property commands after the construction of railroads and the developments and improvements solely attributable to them, then we should produce chaos in titles to a very large portion of the area of the State, and bring about innumerable confusions and hardships in business and material progress.    Prices afterwards prevailing are in no sense a test on this question. Was it a fair price at the time? is the true test.    *Pennybacker* v. *Laidley*, 33 W. Va. 624 (11 S. E. Rep. 39).    Here it may be noted that this land was somewhat depreciated by being cut off by other lands from Blue creek, up which the railroad runs.    And parties competent to contract are alone the judges of prices for their property.    If there be no fraud shown, as the law requires, inadequacy alone can not affect the contract, unless so gross as to shock the conscience.    *Mayo* v. *Carrington*, 19 Gratt. 74; *Hale* v. *Wilkinson*, 21 Gratt. 75; *Pennybacker* v. *Laidley*, 33 W. Va. 624 (11 S. E. Rep. 39); Pom. Eq. Jur. § 926; *Bradford* v. *McConihay*, 15 W. Va. 732.

It may be unfortunate for Mrs. Hale that she did not retain her land, and is decidedly so in the light of after occurrences; but that misfortune has befallen and will befall thousands of people everywhere.    Courts can not for that cause release her from the obligation imposed by her own act.    We must respect the great right of the citizen to make such contract as seemeth meet to him, and remember that when once a contract has been made that right is fully respected and vindicated, only when we recognize the rights of both parties to it, and refuse to abrogate a covenant solemnly made, simply to relieve from what turns out under the operation of after events a hard bargain.

As to incapacity on the part of Mrs. Hale. Her bill does not make her stultify herself by representing her as a lunatic, *non compos mentis* or imbecile, but simply says that she had little knoweledge; and having been raised in the mountains she had not the educational advantages of more favorably situated ladies. When this statement of the contents of the bill under this head is made, we might dispense with any further discussion of the matter of her competency for all the purposes of this cause; for the mere fact, that a person is of inferior or even weak understanding, so he be not an idiot, lunatic, or *non compos mentis*, is no objection to his ability to make a contract binding him, as courts in such cases can not undertake to measure understanding and capacity. *Beverley* v. *Walden*, 20 Gratt. 147; *Dennett* v. *Dennett*, 84 Amer. Dec. 97. But the evidence is that she dictated a will of some length and detail after this time, disposing of her property apparently carefully and considerately among the objects of her bounty; and her husband says she could write a little and read some handwriting and controlled and managed her farm and property. There is some evidence of inferiority of mind, but there is fully as much to show average capacity; and that tending to depreciate her mind relates rather to its condition towards her death years after this contract. She was simply illiterate, but of average mind. But I repeat her bill alleges no such condition of mind as alone to incapacitate her from contracting.

I will add that the charge of the bill that the option was not read to her is repelled by her own evidence that O'Keefe read it to her. Her own evidence going to attack this option is unconvincing and unsatisfactory. Therefore, I think no case has been made to annul the option of the 19th of April, 1881.

Now as to the deed. In deciding in favor of the validity of the option we go very far, aside from other considerations, in upholding the validity of the deed of the 12th of November, 1881, from Mrs. Hale and Graham to Joseph I. Doran, to whom Graham passed his rights under the option; for, if that option is binding, it goes perhaps to the extent of purging all fraud connected with this deed,

so far as that deed merely executed said option, and certainly renders harmless threats of the parties, who took the deed, that they would resort to litigation to enforce it, which without such option might appear in somewhat different light. If in making such deed Mrs. Hale only did what the option called upon her to do, and what a court would have compelled her to do, how can any fraud connected with its execution taint it? Why should a court set it aside simply to turn around and decree performance of it?

But the deed does confer upon the grantee some rights in the way of authority to manufacture coke on the premises, and to make roads for transporting coal and other minerals mined from other land as well as this land, and to lay water-pipes for both mining and manufacturing purposes, not conferred by the option; and hence I shall advert to the causes specially assigned for the cancellation of the deed. The chief one is that O'Keefe and McGeorge, an attorney acting as a conveyancer, representing Doran in obtaining title to various lands in that section, and Furman, his clerk, went to the house of Mrs. Hale, where she was alone with her sister, and was sick with nervous headache, and incapable of business, and remained there several hours, and tendered her some money, and asked her to sign a paper already prepared conveying her mineral interests, which she declined to do, chiefly because of inadequacy of price and the misrepresentations theretofore made to her; that McGeorge claimed superior knowledge over her by reason of being a lawyer, and claimed that by reason of the option she was entirely in his power, and threatened that, if she did not sign the deed, he would bring suit against her and ruin her financially and reduce her to abject poverty; and that he thereby produced such nervousness, excitement and fear, that she was forced to sign the paper without knowing what she was signing, and that, if it was read to her, she had no recollection of it; that ignorant of her rights, and uneducated she was by such menaces worked up to such a state of excitement bordering on delirium, that she did what, had she known the character of the paper, or had had time to consult, no inducement could have prevailed upon her to do.

Thus the pivotal point on which the charge of fraudulent procurement of the deed rests is threat of litigation. We must note at once as to this feature of the case that this threat is not based on a fictitious, unfounded demand, but on a valid contract—the option. Were this not so, such threat or compulsion would come with more force. But where a party has even a colorable, and much more a valid enforceable claim against another, can he not in endeavoring to secure his rights from his unwilling vendor threaten suit in case of non-compliance with his claim without being subject to the charge of duress, and having his deed overthrown for that cause? Many authorities answer this question in the affirmative.

A threat by a judgment-creditor to levy his execution will not make void a promise to pay it. *Waller* v. *Cralle*, 8 B. Mon. 11; *Wilcox* v. *Howland*, 23 Pick. 167. In *Alexander* v *Pierce*, 10 N. H. 494, it was held that if an individual having a legal demand against another should, in the course of urging him to comply with his obligation, tell him, that in case of non-payment he would send him to prison, he could not recover back the money paid; that menace of imprisonment to avoid an act must be "of unlawful imprisonment. The fact, that a creditor by threats to a debtor, that he would resort to legal proceedings to collect a valid debt, induces him to execute a note and mortgage for it, constitutes neither duress nor fraud. *Snyder* v. *Braden*, 58 Ind. 143. In *Davis* v. *Luster*, 64 Mo. 43, where a conveyance was made under threat of prosecution for adultery, the court held, that, unless it appeared that the party was innocent, the deed could not be avoided. A note, the execution of which was induced by threat of lawful imprisonment for assault and battery, in settlement of it, was held not liable to be defeated by reason of duress; but, had the imprisonment been unlawful, the note would have been unlawful. *Eddy* v. *Herrin*, 17 Me. 338; *Hunt* v. *Bass*, 24 Amer. Dec. 274; note to *Hatter* v. *Greenlee*, 26 Amer. Dec. 370. In *Harris* v. *Tyson*, 24 Pa. St. 347, it is said that there is no judicial decision to be found that a deed may be avoided merely by proving a threat to sue the grantor for a good cause of action. See Bish. Cont. § 723; 2 Wait, Act. & Def. 507.

But, in addition to the fact that this threat is vindicated by a valid contract, the character of the threat itself is not such as to amount to duress ; for it was at worst only a threat of a civil suit and ruin of Mrs. Hale by costs.    There was no intimation whatever of duress of person.    A threat of a civil suit is not duress.    Whart. Cont. § 150 ; Bish. Cont. § 723 ; 5 Rob. Pr. 404 ; 1 Pars. Cont. 393.    It may, however, be fairly doubted whether this threat really operated at all upon Mrs. Hale.    She refused to make the deed for several hours, stoutly contesting with those who were urging her to make it, and talking with vehemence and harshness, not by any means yielding promptly as if in craven fear from the threat of litigation.    She evidently sought to make a better bargain and demanded a price beyond her contract, twenty thousand dollars, as she herself says.   She was entitled to only one fourth of the purchase-money down, but she was paid one half down as a concession ; and one or more witnesses say, that, when this was accorded, she signed the deed.

As to her being sick, it was at most only a headache. O'Keefe says that when she saw them coming to the house, on the occasion when the deed was made, she lay down on a lounge, and pretended to be sick, and gave that as a reason for refusing, and that they convinced her she was not sick ; and then she alleged that she held the land in trust for her brothers and sisters, but finally made the deed when she was paid half instead of one fourth of the money ; and he says they were the best part of a day getting her to sign.

McGeorge says when they entered the house, she said she was sick, and they talked, and her health seemed to greatly improve, and she became quite bright before they left ; that his judgment is that she was in perfect mental condition, and if there was any physical ailment about her, it was so trifling that it was forgotten, as soon as she became interested in conversation ; and that, after they agreed to pay half the purchase-money, all indisposition to make the deed seemed to pass away, and she treated them pleasantly ; and that the sudden disappearance of the indisposition, of which she complained when they first met her, was a subject of comment and amusement afterwards.

It can not be plausibly said, that the representation to her by McGeorge, that she was legally bound to make a deed under the option, was a fraudulent representation; for it was but the expression of a legal opinion and, moreover, was merely a declaration of what he claimed as the rights of Graham under the option; and further, it is certainly not law, that, where a party to an executory agreement in seeking to obtain compliance with it maintains his rights under it, as he claims them to be, is guilty of fraud, which will vitiate a deed made by the other party, even if his rights were not such as he claimed. If this were so, multitudes of instruments would fall. Both parties had equal chance to form an opinion as to the obligation of the agreement. It was made April 19th and the deed November 12th. Some weeks after the option was made, she refused to acknowledge it for recordation, showing that she then hesitated about it. She had months in which to seek advice as to its validity before she made the deed.

As to the allegation of the bill that she did not know the character of the instrument, it is clearly proven that the deed except formal printed parts was written at her house and carefully read to her. She says she thought it was only an option. Why should she think it was an option, when she had already given an option? Under the evidence, even her own, I think it clear that she knew the character of the paper. When one signs a writing he must know what he signs. Bishop in his work on Contracts, s. 346, lays down the rule: "One is never required to, and never should, execute any written instrument without first becoming fully acquainted with its contents. He should read it, if able; or, if illiterate, have it read to him. And when he has signed a written contract, the law *prima facie* presumes that he discharged this duty; therefore, whether in fact he did it, or chose to waive the privilege, his signature binds him."

All the grounds, on which she could have objected to the making of the deed, were known to her long before she made it, as is shown by the fact that she refused shortly after the date of the option to acknowledge it. And as to inadequacy of price she herself states that an old miner told

her before the deed was made, that the coal was worth one hundred dollars *per* acre; and she says, that, when Mc-George and O'Keefe were demanding a deed, she told them she would make one, if they would give her twenty thousand dollars, so she could make it satisfactory with her heirs. It appears from her evidence that her heirs were urging her not to make the deed. It seems to me clear that the objection of her kindred and a desire to get a larger price, not fraud practiced upon her, were at the bottom of her refusal to make the deed.

Next as to the defence of laches. It is argued that, as this defence is not made in the answer, the defendant can not have benefit of it on demurrer. This position is sought to be sustained by the language of the judges in *Sale* v. *Dishman*, 3 Leigh, 548; but it can not be sustained, for it is opposed to the case of *Jackson* v. *Hull*, 21 W. Va. 601, wherein Judge SNYDER says: "It is now clearly the rule in equity, that the statute of limitations or objections in analogy to it upon the ground of laches, may be taken advantage of by demurrer as well as by plea." This language is the text of 1 Daniel, Ch. Pr. p. 559, § 9, where many authorities are cited. And the United States Supreme Court in *Bank* v. *Carpenter*, 101 U. S. 567, held: "Where it appears by the bill that the remedy is barred by lapse of time, or that by reason of his laches he is not entitled to relief, the defendant may by demurrer avail himself of the objection."

I am convinced that this defence of laches is alone a complete bar to the plaintiff's bill. The option dates April 19, 1881, the deed November 12, 1881, the suit in May, 1887, a period of more than six years from the date of the option and five and a half from the date of the deed. Decisions of this Court furnish emphatic authority on this subject. *Trader* v. *Jarvis*, 23 W. Va. 100, holds that "delay in the assertion of a right, unless satisfactorily explained, even where it does not constitute a positive statutory bar, operates in equity as evidence of assent, acquiescence or waiver; and especially is such the case in suits to set aside transactions on account of fraud or infancy. Laches and neglect are always discountenanced in a court of equity." There was a delay of nearly seven years there.

In *Curlett* v. *Newman,* 30 W. Va. 182 (3 S. E. Rep. 578) there was an attempt to set aside a deed, as in this case, for misrepresentation and fraud nearly five years after its date, and the court called it a "great delay" in commencing suit, and refused relief. See *Hale* v. *Cole,* 31 W. Va. 585 (8 S. E. Rep. 516) in opinion, where there was a delay of five years. It was a case to set aside a deed for fraud and undue influence. See *Doggett* v. *Helm,* 17 Gratt. 96 ; *Pusey* v. *Gardner,* 21 W. Va. 470 ; *Walker* v. *Ruffner,* 32 W. Va. 297 (9 S. E. Rep. 215). The United States court in *Harwood* v. *Railroad Co.,* 17 Wall. 81, refused to set aside a sale for fraud made five years before the suit. In *Strong* v. *Strong,* 102 N. Y. 69 (5 N. E. Rep. 799) it is held, that the right to rescind for fraud must be exercised immediately upon its discovery, and any delay in doing so will be deemed an election to affirm it. In *Sieveking* v. *Litzler,* 31 Ind. 13, it is held, that he must act at once on discovery of fraud, and there was only a delay of two months there, which was given as a reason for refusal of relief. *Barton* v. *Simmons,* 14 Ind. 49, holds, that it is too late after nineteen months to rescind a land-sale for misrepresentation. In *Hunt* v. *Blanton,* 89 Ind. 38, an offer to rescind a purchase of land for fraud made five months after conveyance came too late. In the Illinois case of *Cox* v. *Montgomery,* 36 Ill. 396, it was held, that a bill filed eighteen months after discovery of fraud in a land exchange was unreasonably delayed. In *Barnett* v. *Barnett,* 83 Va. 504 (2 S. E. Rep. 733) the court said : "The rule is, that, where a party has a right to rescind a contract, on the ground of fraud, he must rescind at once on discovering the fraud, or as soon thereafter as circumstances will permit; for he is not bound to rescind, and any unreasonable delay, especially if it be injurious to the other party, will be regarded as a waiver of his right. This is well settled. *Grimes* v. *Sanders,* 93 U. S. 55, and cases cited. Yet, in the present case, the bill was not filed until April, 1885, though the contract was made in June, 1879, and no explanation is given in the bill for complainant's delay in applying for a recission." 1 Pom. Eq. Jur. § 418.

These authorities (and many more could be cited) show

with what rigor the maxim *vigilantibus non dormientibus æquitas subvenit* is enforced by courts of equity, and that we do not limit the plaintiff within a period too short.   Mrs. Hale knew the character of both these papers when they were made, as I think is clearly shown by the evidence; and she herself distinctly states as a witness in her examination in chief that she did not know it was a deed at the time she signed it, but found it out two weeks afterwards; that J. S. Carr told her she had sold her land and made a deed for it, and she told him it was only an option, and he examined it and again told her she had made a deed." Thus, at latest, she discovered this alleged fraud two weeks after the date of the deed.   But to make the case stronger against her, she not only thus delayed, but, about two years later, when McGeorge went to her house to hunt tax-receipts and papers concerning the land, she spent much time in looking them up, and gave them up to him; and she several times wrote urging payment of the unpaid purchase-money due under the sale.   Thus she ratified the contract, and waived her right to impeach the deed for fraud.  5 Wait, Act. & Def. 522; Kerr, Fr. 301.

I confess that, in view of the loss consequent upon after events suffered by the kindred of Mrs. Hale (for she died in June, 1888) from this sale, I have felt a leaning towards her side of the cause; but I see no substantial view upon which it can be decided for her.   The strongest feature in her favor is that the deed confers rights upon the grantee beyond the option as above stated, and there was a down-payment of half instead of one fourth of the purchase-money, as called for by the option, but as to that, we have to say that she was competent to make such deed as she liked, and such is her deed; and in addition the same principles of laches apply to this feature of the deed as to others.   Both as to the option and the deed the case made by plaintiff is not sufficient.   See *Pennybacker* v. *Laidley,* 33 W. Va. 624 (11 S. E. Rep. 39).   Decree reversed, and bill dismissed.

REVERSED.